Rector *v.* Rector *et al.*

HENRY RECTOR, who sues by his guardian, Stephen Triggs, plaintiff in error, *v.* LYDIA RECTOR *et al.* defendants in error.

*Error to Alexander.*

Although, as a general rule, it is not licensable, on account of the multiplicity of irrelevant and improper issues which would thereby be presented, to attack the general character of an impeaching witness, yet it is proper and highly important for the purposes of justice that a Court or jury trying a cause should know whether such, as well as any other witness, is incapacitated from giving testimony on account of mental alienation, without regard to the causes by which it may have been produced.

In the absence of any positive provision of law to the contrary, an infant will not be prejudiced or injured by lapse of time.

The general rule is, that the answer of one co-defendant in chancery shall not be evidence against another; but to this rule there are exceptions. When such defendants are partners, or when one has acted as the agent of the other in any transaction to which the answer may relate, and the agency or partnership at the time of filing such answer still exists, the answer of the partner will be evidence against his copartner, and that of the agent against his principal, when such copartner or principal claims through or under such agent or partner.

After a long period has elapsed, Courts will be cautious in enforcing the specific performance of a contract where there is any real doubt about its existence and its terms; and especially when the contract is lost or destroyed, it should be made satisfactorily to appear what were the substantial conditions and covenants which are sought to be enforced.

The presumption of innocence may be overthrown, and a presumption of guilt be raised by the misconduct of a party in suppressing or destroying evidence which he ought to produce, or to which the other party is entitled.

The rule is, when a party refuses to produce books and papers, his opponent may give secondary or parol proof of their contents, if they are shown to be in the possession of the opposite party; and if such secondary evidence is imperfect, vague and uncertain as to dates, sums, boundaries, &c., every intendment and presumption shall be against the party who might remove all doubt by producing the higher evidence.

| 8 | 105 |
|---|---|
| 138 | 538 |
| 8 | 105 |
| 144 | 638 |
| 40a | 634 |
| 8 | 105 |
| 152 | 360 |
| 8 | 105 |
| 83a | 294 |
| 8 | 105 |
| 184 | 203 |
| 8 | 105 |
| 94a | ⁵652 |
| 3g | 105 |
| 101a | ⁶591 |

BILL IN CHANCERY, in the Alexander Circuit Court, filed by the plaintiff in error against the defendants in error, and heard before the Hon. Walter B. Scates at the October term 1842. The bill was dismissed for want of equity.

The substance of the bill appears in the Opinion of the Court.

*S. T. Logan,* and *A. T. Bledsoe,* for the plaintiff in error.

I. Though the complainant's bill was founded on a lost instrument, it was not necessary to file an affidavit of loss. The rule which requires an affidavit of loss to be filed, applies only to cases in which, if the instrument had not been lost, a complete remedy might have been had upon it at law. 3 Barb. & Har. Dig. 40, 41; Story's Eq. Jur. §§ 477–8; 2 Bibb, 558.

II. As the bond in question is proved to have been in possession of defendant, and there is some proof of the contents thereof, so it is to be taken most strongly against him. The Court will presume that it contained everything which such bonds usually contain, and which can be in favor of complainant. 1 Stra. 505; 1 Camp. 8; *Life & Fire Ins. Co.* v. *Mech. Ins. Co.* 7 Wend. 31; 1 Greenleaf's Ev. 43.

III. Notice to agent is notice to principal. 2 Powell on Mort. 581–6; 3 Atk. 646; Fonb. Eq. 420; Prin. & Agent 283; Story on Agency, 131, § 140.

IV. Every artifice or device by which a man is designedly deprived of his right is fraud; and a Court of Equity will afford relief. 2 Vesey, 155; Story's Eq. Jur. §§ 187–8, 192, 254.

*D. J. Baker,* for the defendants in error.

A decree for a specific performance of a contract for the conveyance of land was refused, because a certain and definite contract was not made out, &c. *Carr* v. *Duval,* 10 Peters, 77.

A Court of Equity will not enforce a specific performance of a contract as between the original parties, unless its terms are clear, definite and positive; and *a fortiori,* when the specific performance is sought to be enforced against an assignee. *Kendall* v. *Almy,* 2 Sumner, 298; 1 Peters' Dig. 461, § 448; *Colson* v. *Thompson,* 3 Conn. 143.

The discretion of the Court in granting or refusing a spe-

cific execution is regulated by established principles. *Revel* v. *Hussey*, 2 Ball & Beatty, 288.

To obtain a specific performance, the case should be clear of doubt. Hammond's Dig., 16; 2 Scho. & Lef. 7; ib. 549.

A bill for a specific performance is an application to the discretion, or extraordinary jurisdiction of the Court, which cannot be exercised in favor of persons who have slept upon their rights, or have acquiesced for a long time in a title or possession adverse. 1 Ball & Beatty, 69.

A party seeking to disturb another in the possession of the legal title ought to show a clear equity. *Rucker* v. *Howard*, 2 Bibb, 268.

To authorize a decree enforcing a contract, the agreement should be complete in all its parts. 3 A. K. Marsh. 400, 445; 1 Wash. 290; 3 J. J. Marsh. 546.

A mere gratuity will not be enforced in equity. 3 A. K. Marsh. 436.

Equity will not enforce a contract specifically, which, by subsequent events, will impose great loss or hardship on the defendant, but will leave the party to his remedy at law. 4 Littell, 398.

The power of the Chancellor to enforce specific performance is one exercised, not on every occasion, but is guided by legal discretion, and does not belong, as of right, to every meritorious contract. As a general rule, the Chancellor will not interfere with a party's remedy at law upon a breach of contract for conveyance, unless there are circumstances calculated to make it an exception. *Caldwell's Heirs* v. *White*, 4 Monroe, 567.

A bill for specific performance is addressed to the discretion of the Court. Gilman's Dig. 131; 2 Blackf. 273.

After a long delay and laches, a Court of Equity will not decree a specific performance; especially where there has been a material change of circumstances and injury to the other party. *A fortiori*, it will not decree against purchasers, even with notice, if their vendor is dead and insolvent, so that they can have no remedy over. 5 Mason, 244.

Rector *v.* Rector *et al.*

The Opinion of the Court was delivered by

Purple, J.*    On the 8th day of May, A. D. 1834, the plaintiff in error filed his bill in Chancery in the Alexander Circuit Court, complaining that Elias Rector, in his lifetime, contracted with Stephen Rector for the purchase of one half of fractional section No. 27, in township 15 south, of range 1 east, of the third principal meridian in the said county of Alexander.    That the price for which the parties contracted was unknown, but the purchase money was fully paid.    That Stephen Rector executed his bond to Elias Rector, covenanting therein to convey the same to said Elias by general warranty, as soon as he should receive a patent therefor from the United States; he, Stephen, at the time only claiming a right to the land by virtue of a certificate of entry and purchase from the United States, which showed that one fourth of the purchase money due on the land ($309·56) only had been paid.    That Stephen was to pay the residue of the purchase money.    That Stephen died, not having performed the conditions and covenants of his bond.    That Lydia Rector, his widow, became his administratrix.    That Elias died also before any deed for said land had been made to him, leaving Henry Rector, the plaintiff, his sole heir.    That William Rector administered on Elias' estate, died, and administration *de bonis non* was granted to Stephen Triggs.    That Stephen Rector, in his lifetime, and his administratrix after his death, failed to pay to the United States the balance of the purchase money due on the land. That Lydia Rector, although notified of the bond and covenants made by Stephen, her husband, sold and transferred the certificate of purchase for the land to John Skiles, or to him and one James Riddle, who were thereby enabled to obtain a patent for the same, and hold it in their own names. That the said Lydia, together with Stephen, George K. and Thomas C. Rector, had combined and confederated with John Skiles and James Riddle to defraud the plaintiff, and

* Young, J. did not sit in this case.

Rector v. Rector et al.

that they have refused, and still refuse to make him a deed for the land so purchased by the said plaintiff's ancestor, Elias Rector. That Skiles and Riddle, or one of them, purchased the said certificate of Lydia Rector with full notice of the bond and covenants made by Stephen to and with Elias Rector; and that Skiles has paid the balance of the purchase money for the land to the United States, with full knowledge of the plaintiff's claim. That the bond has been lost or mislaid, so that the same cannot be produced. That James Riddle had died, leaving Esther Riddle his executrix, and Mary, James, Henry D., Esther, Charles K. and Margaret J. Riddle his heirs at law.

The bill concludes with a prayer for a conveyance from John Skiles and the heirs of Stephen Rector and James Riddle, of the undivided half of the land before described, to the plaintiff, and for general relief.

The answer of John Skiles, filed on the 4th day of November, A. D. 1834, states, that the land was entered by Stephen Rector at the Land Office in Shawneetown, on the 10th day of May, A. D. 1816, one fourth of the purchase money, $309·56, having been paid at the time of such entry. That on the 17th day of September, 1821, Stephen Rector obtained from the Land Office a certificate of further credit on the same, by which payments were to be made in eight annual instalments, commencing on the 31st day of March, A. D. 1822. That Stephen Rector died insolvent, having made no further payment on the land. That Lydia Rector was appointed his administratrix, and that on the 9th day of June, 1828, she, as administratrix, by deed sold, transferred, and conveyed the said certificate of entry and purchase to the said John Skiles, for the sum of $530·87. That in December, 1828, he lost the certificate, and after due notice procured a duplicate thereof from the Land Office, and about the same time, he paid the residue of the purchase money due on the land, which, after deducting the amount originally paid by Stephen Rector, was $580·42, and on the 12th January, 1831, after due proof of the transfer of the certificate, obtained a Patent for the land in his own name.

That James Riddle furnished a portion of the purchase money, and after he had procured the Patent he deeded to Riddle one half of the land, pursuant to a prior agreement with him. That he knows of no bond from Stephen to Elias Rector, as stated in the bill, and calls for the proof. If there ever was such a bond, he admits that it was made when Stephen had paid only one fourth of the purchase money on the land. That Stephen paid $309·56, and died without performing the covenants in the bond, if it existed; but he has no knowledge whether or not Stephen was to pay the residue of said purchase money. He denies that at any time before he purchased from Lydia Rector, or before he made the final payment to the Land Office, he had any knowledge of the existence of any such bond, or that he made the purchase with any design to defraud the plaintiff. Admits that Elias Rector died some ten years since, but does not know who are his administrator or heirs, and requires proof. Admits that Lydia, administratrix of Stephen, never paid the residue of the purchase money for the land. Does not know whether she had notice of the bond to Elias before she sold the certificate, and requires proof. That he has no knowledge who are the heirs of Stephen Rector.

The heirs of Stephen Rector and James Riddle, by their guardian *ad litem*, Wilson Able, answer generally that they are strangers to the matters charged in the bill.

There is no amendment or supplement filed to the original bill, suggesting the death of John Skiles, but James Skiles, Robert King and Jane his wife, Abraham S. Latta and Elizabeth his wife answer and admit that James Skiles is the son, and Jane King and Elizabeth Latta are sisters of John Skiles deceased, and his sole heirs; and state that they are strangers to all the matters stated in the bill, except that they have heard that John Skiles purchased the land, and in good faith obtained a Patent therefor from the United States, and require strict proof. They refer to, and rely upon the answer of John Skiles.

The plaintiff filed a general replication to the answers.

By the depositions taken in the cause, the complainant

below, proved by Joseph Garnein, that Henry Rector is the son and only heir of Elias Rector deceased, that he believes Skiles paid Lydia Rector $400, or $500, for the certificate of purchase, and that Stephen Rector was insolvent at the time of his death.

By Augustus H. Evans, that in September, 1822, he made an inventory of Elias Rector's papers at the house where he died, and recorded such inventory in a book. That among these papers was a bond, executed by Stephen Rector to Elias Rector, for one half of fractional section, number twenty seven, township fifteen south, range one east, third principal meridian. That he is enabled to make this statement from the circumstances that a list of said Rector's papers appears on file in the county clerk's office, in the hand writing of John H. Langham, and he recollects that Langham made the copy of the list from his book above mentioned, and further, that in 1825 or 1826, a gentleman came from Kentucky, who wanted to purchase said land. That he, witness, went to see Rector (Stephen,) and that he, (Stephen,) then told him *he* did not own the land, that his brother and one Barcroft owned the most, if not all of it, but that Barcroft should never have any of it. That after Stephen Rector's death in 1826 or 1827, in a conversation with Mrs. Rector, his widow, he told her of all the circumstances of the sale made by her husband to his brother Elias. He does not remember whether or not the bond expressed that it was made for a valuable consideration, but is of opinion it conveyed all the right of Stephen Rector to one half the land, when the same should have been paid for by said Stephen. He believed the bond acknowledged the receipt of the consideration money. That Henry Rector is the sole heir of Elias Rector, deceased.

By U. S. Hults, that some time between August and October, 1833, Skiles, in a conversation with witness about valuable tracts of land on the river, informed him that Mr. Webb owned the Caledonia tract, and that he (Skiles) and the heirs of James Riddle owned the adjoining tract on the north. bounding on the Ohio river. That he expressed sur-

prise that Webb had not purchased said last mentioned tract before Skiles did, as he (Webb) had been a long time in the country. That Skiles stated that Webb and others were afraid to purchase, owing to the existence of a certain title bond. That when he (Skiles) came on, he shortly found out that he could make a safe purchase. That he had been to St. Louis, and there ascertained that the bond was lost and would never be found. That this was a bond given for this tract of land. That he then made the purchase of the widow for one half the said land. That then he went to Shawnee-town to get the certificate in his own name. That he had made also the purchase of the other half. That he gave a certain sum for the land, the amount not recollected, and that he gave Mrs. Lydia Rector $50·00 for her right. That he inquired of Skiles if they would not be on him about the bond he had mentioned. That Skiles replied, "How can they when I have the Patent from the United States?" That in the course of the conversation Skiles said that he understood that the bond which was said to have been given by Stephen to Elias Rector had been lost. That he understood from him that it had been lost previous to his purchase of the widow Rector, and about the time of the death of Elias Rector. That he never heard Skiles say he had seen or had any personal knowledge of the bond except from information.

By Henry L. Webb, that in May, 1820, there was a sale of town lots at America; Stephen and Elias Rector were present, and while there Elias proposed selling section twenty seven, in township fifteen north, range one east, third principal meridian, to Doct. Wm. Alexander and witness, at $4 per acre. That under this proposition, if they purchased they were to pay the residue of the purchase money, one payment of fifty cents per acre having been made, which would have made the land cost them $5·50 per acre. That he understood from both Stephen and Elias that the land was their joint property.

By James S. Smith, that in 1828 or 1829, having become acquainted with John Skiles, and having had frequent conver-

Rector v. Rector et al.

sations with him in relation to land in the neighborhood, *he,* witness, mentioned to him, Skiles, section twenty seven, and told him the situation of the land. That Stephen Rector had executed to Elias Rector, a bond for a part of it. That Elias was dead, and there would be no difficulty in procuring the land, provided he could obtain the part held by Elias Rector's heirs. That in consequence of this information, Skiles went to St. Louis, and on his return, informed the the witness, that he had got on a track for obtaining the bond. That he could obtain it from the widow of Stephen Rector; at this time there was some conversation about the loss of the certificate of entry. That Skiles made three journeys to St. Louis, before he completed the purchase. That upon witness inquiring of him about the claim of Elias Rector's heirs, he replied, that he had got the bond. That he had headed the boys. That the bond was no longer in their possession, nor ever would be again. At this time he held a paper in his hand, shaking it towards witness, remarking as above stated. That he, witness, did not read the paper. That he had always understood that James Riddle was interested with Skiles in the purchase. That one day Riddle told him he was dissatisfied with Skiles' conduct towards him. Afterwards he heard Riddle inquire of Skiles for the bond from Rector for one half the land in question. Skiles at each time refused to show it; Riddle was irritated. That after one interview, Skiles said to witness that he did not know that Riddle had any more right than others to see the bond. That no one should see it; and that at another time when Skiles had refused to let Riddle see the bond, Riddle said he would have no responsibility in the purchase from Mrs. Rector. That they, Skiles and Riddle, would divide the lots and land, and Skiles must take the responsibility of that purchase and do as he could with it. That Skiles gave several reasons for the title papers being taken in his name first. That Riddle was not then a resident of the State, and had not then been consulted on the subject. That he might never come to the State to reside, and was pecuniarily embarrassed. That perhaps the cause that Skiles conveyed to

Riddle with warranty, was on account of Riddle's objection to the manner of obtaining the part of the land claimed under the bond to Elias Rector. That he never saw the deed to Riddle, and never heard Barcroft's name mentioned in any of the conversations.

William Price, a witness for the defendants, stated that he once saw a bond from Stephen Rector to Elias Barcroft.

Cyrus Lynch and Nicholas Smith testified, on the part of the defendants, that they would not believe U. S. Hults under oath.

Jesse Echols stated, that he thought Skiles purchased the land he lived on about 1828. That he understood the same had before that time belonged to Stephen Rector.

Joseph W. Echols stated, that while Smith lived with Skiles, he heard Skiles speak about a bond to Barcroft; that he never heard him speak of one to Elias Rector.

Eli B. Clemson, for plaintiff, stated that Skiles had great influence over Nicholas Smith and Cyrus S. Lynch. That Nicholas Smith was a very intemperate man, and his intellect, in his opinion, impaired by drink. That he should discredit his testimony when Skiles was a party. That he had a good opinion of Hults, and would credit his testimony.

Henry L. Webb stated that Nicholas Smith was intemperate and vindictive, and his character bad. That he had known Hults for some years, and should have implicit confidence in his word or testimony. That, at the time Skiles made the purchase of Mrs. Rector, it was generally known in the neighborhood that Capt. Spotts had declined to purchase the land, on account of the claim of Elias Rector's heirs.

William Echols stated that Nicholas Smith was intemperate. That he died in the fall of 1838. That his testimony could not be relied upon, when he or his friends were interested.

Considerable other testimony is introduced into the record, but most, if not all of it, is hearsay, irrelevant and unimportant in its character.

The most important questions involved in this case are questions of fact merely.

The first is, in relation to the existence of the bond set forth in the bill of complaint.

The solution of this question depends upon the testimony of Evans, Hults and Smith. That such a bond might have existed, is not positively denied by any of the defendants. It is a matter about which they could not answer by direct denial, or in such manner as to render it necessary to disprove the answer by the testimony of more than one witness.

Evans distinctly states, that he saw a bond executed by Stephen to Elias Rector, for one half the land in controversy, in September, 1822. This bond was then, which was subsequent to Elias Rector's death, among his papers. The witness believed it acknowledged the receipt of the consideration money, and conveyed all the right of Stephen to one half the land, when the same should have been paid for by Stephen. This testimony alone, uncontradicted and unimpeached, as it is, is sufficient to prove the existence of substantially such a contract as the complainant's bill describes. That the consideration money had been paid, is properly inferred from the admission of Stephen Rector to Webb and Evans, at a time when he had no interest to misrepresent the facts. The admission in substance is, that one half the land belonged to Elias Rector. Add to this the statements of Skiles to the witnesses Hults and Smith, and if the witnesses are credible, every reasonable doubt must be removed.

The next question of fact to be determined is, had Skiles, at the time he purchased the certificate of entry of Mrs. Rector, Stephen's administratrix, notice of the existence and conditions of this bond? This, in his answer, he most positively denies. His answer must be considered as true unless disproved by two witnesses, or by one witness and corroborating circumstances.

We think the evidence justifies the conclusion, that in this respect, his answer is untrue. According to the statement of Smith, he was the first to give Skiles information relative to the situation of the land; and at the same time he

told Skiles of the claim of Elias Rector's heirs to a portion of the tract. Skiles acted upon this information, went several times to St. Louis, and finally, as he admits, got possession of the bond. Substantially the same facts testified to by Smith are related by Hults, as having been detailed to him by Skiles. That in 1833, Skiles told him, that when he first came to the country, he ascertained that Webb and *others* were afraid to purchase the land, on account of the claim of Elias Rector's heirs. That he (Skiles) went to St. Louis, and ascertained that the bond to Elias Rector had been lost, and that he could safely make a purchase of the land; that he then purchased of the widow Rector one half, and of some other person the other half of said tract.

Skiles cross-examined this witness himself, and in that examination asked him, if he had heard him say that he had ever seen, or had any personal knowledge of the bond; and did not by any interrogatory, or otherwise, so far as this record shows, intimate that the bond to Barcroft, or to any other person than Elias Rector, was the subject matter of the conversation; nor can any reasonable inference be drawn from any of the testimony, that these conversations and admissions had reference to any other bond.

Webb also testifies, that at the time Skiles purchased, it was generally known in the neighborhood that Elias Rector's heirs had a claim to the land. This circumstance alone would not conclude the defendant Skiles upon this point; but in connection with the other evidence, it tends to establish his knowledge of the plaintiff's equity. Hults and Smith are sustained by each other in almost every material portion of their testimony bearing upon this question. Either their evidence, or the answer of defendant Skiles must be discredited. They are not susceptible of reconciliation. The law attaches greater weight and importance to the former, and leaves us no alternative but to declare that the latter is disproved.

An unsuccessful effort is made to impeach the character of Hults for truth and veracity. Cyrus S. Lynch and Nicholas Smith swear that they would not believe him under oath.

Rector *v.* Rector *et al.*

The reason assigned by Smith is, that on an occasion when he was indicted and Hults was a witness in the case, his testimony was different from what he had reason to expect it would have been from intimations which he had received from Hults. Smith is not asked, nor does he state, whether he knows Hults' general reputation for truth, but says he would not believe him under oath nor any other way.

Now it appears from statements made by other witnesses, that Smith was an intemperate man, and by the opinion of one that his intellect was somewhat impaired. They also add that he was naturally vindictive in his character, that Skiles had an undue influence over him, and that little reliance could be placed upon his testimony.

Although as a general rule, it is not licensable on account of the multiplicity of irrelevant and improper issues which would thereby be presented, to attack the general character of an impeaching witness, yet it is proper and highly important for the purposes of justice, that a Court or jury trying a cause should know whether such, as well as any other witness, is incapacitated from giving testimony on account of mental alienation, without regard to the causes by which it may have been produced. Webb and Clemson both declare that every reliance can be placed upon the testimony of Hults. Under these circumstances, we do not consider the testimony or character of this witness at all impeached. Several questions of law have been presented and argued by the counsel, some of which will be briefly noticed. On the part of the defendants it has been urged:

*First,* That the complainant below is barred by lapse of time, from insisting upon a specific performance of this contract;

*Second,* That Riddle was a *bona fide* purchaser from Skiles, and therefore he and his heirs cannot be affected by Skiles' knowledge of the existence of the bond from Stephen to Elias Rector; and that Skiles' answer is not evidence against him or them, to prove any fact material to the issue;

*Third,* That there is no sufficient evidence of the contents of the contract alleged to have been lost; and

*Fourth,* That in transferring the certificate of purchase, the administratrix of Stephen Rector was justified by law, and therefore the plaintiff, after such sale, could have retained no legal or equitable interest in the land.

The first objection is answered by the second, which shows that this suit was instituted in the Court below, while the the complainant there was yet a minor, and personally incapable of asserting his claim in a Court of justice; and however reluctant Courts may be to decree specific performance in ordinary cases, when parties have long and voluntarily slept upon their rights, as yet they have never held that this inclination on their part against stale claims can properly apply in such a case as this; when, by reason of his tender years, the party is disqualified to prosecute his suit in person. If such ·is the general rule, the present case is clearly an exception. In the absence of any positive provision of law to the contrary, an infant will not be prejudiced or injured by lapse of time.

With reference to the second point, independent of the answer of Skiles, there is sufficient in the record to raise the presumption that Riddle was his partner in the original purchase of the land. This is manifest from his conversations with Skiles about the bond, as detailed by Smith, and his declarations to Smith before Skiles conveyed to him. The general rule is, that the answer of one co-defendant in Chancery shall not be evidence against another. · To this rule also there are exceptions. When such defendants are partners, or when one has acted as the agent of the other in any transaction to which the answer may relate, and the agency or partnership at the time of filing such answer still exists, the answer of the partner will be evidence against his copartner, and that of the agent against his principal, when such co-partner or principal claims through, or under such agent or partner.

But in this case, Riddle was not a *bona fide* purchaser from Skiles. The evidence warrants the conclusion that they were alike interested in the purchase from Mrs. Rector, Skiles acting as the agent of Riddle in the transaction.

Their interests are identical and not adverse, and so far as is shown by the record, the representations of each still occupy the position of their ancestors as joint proprietors of the land. This community of interest being proved by other testimony, the answer of Skiles is evidence against Riddle and his heirs, especially so far as it may tend to prove the existence or notice of the existence of the bond from Stephen to Elias Rector. Notice to Skiles, who was his agent and partner in the purchase, is notice to Riddle and to his heirs. But in this particular case, the heirs of Riddle are not in fact prejudiced by the answer of Skiles. In it he denies all knowledge of the bond whatever.

A third objection to the decree, as prayed for in this case, is not unworthy of attention. After a long period has elapsed, Courts will be cautious in enforcing the specific performance of a contract where there is any real doubt about its existence and its terms; and especially when the contract is lost or destroyed, it should be made satisfactorily to appear what were the substantial conditions and covenants which are sought to be enforced. To ascertain the terms of this contract we must rely mainly upon the testimony of Evans, the admissions of Skiles, and such presumptions as the law applicable to the facts implies. Evans saw the contract, knew that it was conditioned for the conveyance of one half the land in question, and believed that it acknowledged the payment of the consideration money, and that the conveyance was to be made when the obligor should have paid the residue of the purchase money to the United States. Skiles admits the existence of a bond executed by Stephen to Elias Rector for the conveyance of one half the same land to two, and that he had got the bond into his own possession, to one of the witnesses whose testimony has been given in this case.

The evidence goes further, and, by showing that Skiles having had the same in his possession and neglecting or refusing to produce it upon the trial, raises strong presumptions and intendments of law against himself.

"The presumption of innocence may be overthrown, and and a presumption of guilt be raised by the misconduct of a

party in suppressing or destroying evidence which he ought to produce, or to which the other party is entitled. Thus, the spoliation of papers material to show the neutral character of a vessel furnishes a strong presumption *in odium spoliatoris* against the ship's neutrality. A similar presumption is raised against a party who has obtained possession of papers from a witness after the service of a *subpœna duces tecum* upon the latter for their production, which is withheld. The general rule is *omnia presumuntur spoliatorum.* His conduct is attributed to his supposed knowledge that the truth would have operated against him." 1 Greenl. Ev. 43.

"The rule is, when a party refuses to produce books and papers, his opponent may give secondary or parol proof of their contents, if they are shown to be in the possession of the opposite party; and if such secondary evidence is imperfect, vague, and uncertain as to dates, sums, boundaries, &c., every intendment and presumption shall be against the party who might remove all doubt by producing the higher evidence." *Life & Fire Ins. Co.* v. *Mechanics' Ins. Co. N. Y.* 7 Wend. 31.

We think there is sufficient evidence to warrant the belief that Skiles once had this contract in his possession. If so, the preceding principles of law apply with all their force against him. The most material portions of it are proved. It is only uncertain as to the date, penalty, and unimportant particulars of the covenants or conditions, and in these respects the plaintiff's case is aided by legal intendment and presumption.

In favor of the fourth point no sound argument can be advanced. It is true, that by the law of this State the administratrix of Stephen Rector had a right to dispose of the certificate. Rector himself in his lifetime had the same right. Although by the payment of one fourth of the purchase money he had not acquired a title as against the United States, yet he had an inchoate interest, which, upon the payment of the residue, would confer upon him or his assignee a perfect legal title.

The law had made these certificates and the interest ac-

quired under them property; and as between the holder and third persons, subject to the same rules, and the same assignable and transferable qualities, as other property of a similar character.

Whether the owner's interest then was of a real or personal nature, would be entirely immaterial. If, in his lifetime, he had parted with that interest, or any portion of it, it would be a violation of first principles to contend that such interest could descend to, or vest in his heirs or administratrix, or that they, or she, could transfer the same to another, in fraud of a prior *bona fide* purchaser.

The decree of the Circuit Court of the county of Alexander is reversed, and a decree entered in this Court, that the plaintiff in error, Henry Rector, pay into the hands of the clerk of the Circuit Court of the county of Alexander the sum of two hundred and ninety dollars and twenty one cents, and interest thereon, at the rate of six per cent. per annum, from the first day of December, A. D. 1828, up to the time of such payment, being one half the purchase money advanced by John Skiles and James Riddle for the tract of land in this decree hereinafter mentioned, and legal interest thereon from the time of such advancement, to and for the use and benefit of the defendants, the legal heirs of John Skiles and James Riddle, deceased; which said sum of money shall be paid out and distributed to them, the heirs of said Skiles and Riddle, under the order and direction of the Circuit Court of Alexander county, in such sums as they may, in the judgment of said Court, be respectively entitled to receive. Said money and interest to be paid to the said clerk within six months from the date of this decree.

And it is further ordered and decreed, that the said defendants, James Skiles, Robert King, and Jane King, his wife, Abraham S. Latta, and Elizabeth Latta, his wife, (the said James, Jane and Elizabeth being the heirs at law of John Skiles, deceased,) Esther Riddle, Mary Riddle, James Riddle, Henry D. Riddle, Esther Riddle, Jr., and Charles K. Riddle, heirs at law of James Riddle, deceased, within the period of two months after the expiration of the six months

before mentioned for the payment of said money, in case the same shall have been paid as aforesaid, make, execute and deliver to the said Henry Rector, plaintiff in error in this suit, a deed, or deeds, in fee simple, with covenants of special warranty against all incumbrances done and suffered by them, or any of them, to the equal undivided half part of fractional section number twenty seven, (27,) in township number fifteen, (15,) south, of range number one, (1) east of the third principal meridian in the county of Pulaski, formerly Alexander.

And it is further ordered and decreed, that in default of the said defendants making and delivering said deed or deeds, in manner aforesaid, that the Master in Chancery of the county of Alexander be, and he is hereby appointed a commissioner on their behalf, to make, execute and deliver the same, pursuant to the decree hereby rendered.

It is further ordered, adjudged, and decreed, that in case the plaintiff in error shall neglect and refuse to pay said sum of money, and interest thereon, within the time prescribed herein, that then his said bill of complaint shall stand dismissed at his costs, both in this Court and in the Court below. And in case the same shall be duly paid, in manner aforesaid, then each party shall pay one half the costs of this proceeding, both in this Court and in the Court below.

*Decree reversed.*