MAYNARD LEE MASSA, Appellee, v. THE DEPARTMENT OF REGISTRATION AND EDUCATION, Appellant.

Fifth District   No. 5—84—0478

Opinion filed December 18, 1985.

KARNS, J., dissenting.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, and Edward M. Kay, Assistant Attorney General, of Chicago, of counsel), for appellant.

Thomas A. LeChien, of LeChien & Associates, of Belleville, for appellee.

JUSTICE HARRISON delivered the opinion of the court:
Defendant, the Department of Registration and Education (hereinafter the Department), appeals from a judgment of the circuit court of St. Clair County reversing the revocation of plaintiff's veterinary license.

The Department filed a six-count complaint against plaintiff, Dr. Maynard Lee Massa, in October of 1982. Count I alleged plaintiff was guilty of gross malpractice in treating a female German shepherd. The Department found plaintiff was guilty of gross malpractice and revoked his veterinarian's license under count I. The Department reprimanded plaintiff for violations under counts III through VI. Plaintiff filed a complaint in the circuit court for administrative review of the agency's action on count I, and did not challenge the action taken on the other counts. The circuit court reversed the Department's finding of gross malpractice under count I as being contrary to the manifest weight of the evidence, and affirmed the findings on the other counts. We affirm the circuit court judgment.

The evidence under count I began with testimony from John Drexler, a part-time dog breeder, who owned an 18-month-old female German shepherd named Palamor's Charlie of Merivern, nicknamed Charlie. Patricia Turisse was co-owner of the dog, but it lived at Drexler's house. The owners had unsuccessfully attempted to breed the animal at one year of age.

On the Saturday of the Memorial Day weekend of 1980, Drexler noticed the dog had not eaten and appeared to be sick. On Sunday morning, the dog was listless and had a temperature of 105 degrees, about four degrees above normal for a dog of this type. Drexler began telephoning veterinarians but received no answer from several. The only veterinarian to answer Drexler's call was plaintiff. Drexler took the dog to plaintiff's office that Sunday morning.

Drexler left the dog with plaintiff, and was later in contact with him several times by phone. During one of the conversations plaintiff mentioned the possibility of surgery. On Monday, Drexler gave plain-

tiff permission to operate after plaintiff had told him the dog would die without surgery. Drexler told plaintiff this was a breeding animal, and that plaintiff should remove the reproductive organs only if necessary to save the dog's life.

Drexler later phoned plaintiff to withdraw the consent for surgery. Plaintiff told him he was in the middle of the operation at the time. Drexler then requested plaintiff to save any parts removed from the dog. Plaintiff responded that he was not a machine shop and did not save parts.

Patricia Turisse, co-owner of the dog, testified she spoke with plaintiff by phone on Monday evening. He told her he had removed the dog's uterus because it was three times its normal size and was about to rupture. Turisse requested that the uterus be turned over to her, but said she was told by plaintiff at first the uterus was in the garbage, and later that it had been burned.

On Tuesday, the dog died. Turisse picked up the body from plaintiff's office and turned it over to another veterinarian for examination.

The Department's main expert was Dr. Gregory Petkus, a veterinarian. He performed a necropsy, or autopsy, upon the animal. He testified the liver was enlarged and the spleen was three times its normal size. He stated there was no evidence of any infection in the abdominal cavity. He stated the condition of the abdominal cavity was not consistent with removal of a uterus three times its normal size, based in part on the fact there was no enlargement of the arteries and veins surrounding the uterus. He stated, however, that it is not always possible to detect a diseased uterus from the area surrounding it. Dr. Petkus testified it was his opinion the removal of the uterus was a good job of surgery but he further stated that the incision on the dog, which was measured at six centimeters, was not large enough to remove a uterus three times its normal size. Dr. Petkus testified the dog did have phyothorax with pleurisy and pneumonia. He found fluid in the right lung and evidence of infection in the thoracic cavity.

Dr. Petkus also testified that pyometra, which is an infection of the uterus, can be difficult to diagnose, that the disease was very subtle, and that surgery was the only treatment for it at the time this case arose. He stated that in the vast majority of cases, prolonged preoperative supportive therapy rarely is associated with clinical improvement in pyometric situations. He also stated that one of the symptoms which plaintiff described the dog as having, namely a certain level of white blood count, was consistent not only with the lung

problem but was also consistent with the diagnosis of pyometra. Further, he stated that if the dog had pyometra and the uterus was about to burst, surgery to remove it should be done before treatment of a problem with the lung. He stated that if the uterus was not about to burst, treating the pneumonia first would be preferable.

Another expert, Dr. David Helland, testified there was no evidence of disease in the dog's reproductive system which would have caused death. He stated the dog suffered from bronchopneumonia with pleuritis. Dr. Helland stated it was his opinion that plaintiff's failure to diagnose the pneumonia while removing a healthy uterus constituted not only negligence but also gross malpractice.

Plaintiff testified that he did treat Charlie over the Memorial Day weekend of 1980. He stated that he listened to the dog's lungs with a stethoscope, and found there was lung difficulty. He found the abdomen tender and noticed some discharge from the vagina. The discharge showed possible pus formation. He conducted various tests, which he stated indicated an infection of the uterus, or pyometra. He gave the dog various drugs based on his diagnosis.

Plaintiff testified although he knew there was some lung difficulty, he did not deem it as serious as the Department's experts felt it to be. He believed he was dealing with infection of the uterus because of the discharge of pus from the vagina. Plaintiff realized an X ray would have been helpful for the diagnosis, but he did not have X-ray facilities available at his office, and felt the dog was not healthy enough to make the trip to the nearest facility with X-ray equipment, which was 20 miles away.

He further testified that after treatment of the dog by various means on Sunday night, on Monday the dog was showing signs of improvement. But because pus was still present, he still felt pyometra existed and that surgery was necessary. He stated he told Drexler of the pyometra and the likelihood of removing the uterus. He also told Drexler about the lung involvement.

Plaintiff removed the dog's uterus during surgery on Monday. Plaintiff testified the incision was longer than six centimeters. On Tuesday the dog died.

Plaintiff testified it was his opinion the dog died of shock, stress, and a secondary pneumonia involvement, with toxemia from the infected uterus also contributing. He also presented two experts. One was Dr. Lowell Webb, who said he discussed Charlie's case with plaintiff while the dog was still alive. Plaintiff related the dog's symptoms to Dr. Webb, who testified that he told plaintiff surgery to remove the uterus was necessary. Dr. Webb viewed the uterus the day after it

was removed. Dr. Webb viewed a photograph which he said showed a uterus similar to the one removed from the dog, and said the uterus in the photograph was infected. He further testified that pyometra is very difficult to diagnose, and that when there is pus discharge, that is a clear sign of pyometra. He also stated that when pyometra, with the uterus about to rupture, and pneumonia exist simultaneously, surgery to remove the uterus should be done first before addressing the pneumonia. He also testified the uterus removed from Charlie could be removed through a six-centimeter incision.

After hearing the evidence, the Veterinarian Examining Committee made the following findings and recommendation:

"A necropsy revealed no evidence of uterine infection. A 6 centimeter incision appeared on the animal's abdomen. The cause of death was pyothorax; both lungs showed lesions, abscesses and adhesions, and the right lung contained 250 mil. of fluid.

Respondent advised the owner that the uterus had been destroyed. At the hearing, Respondent admitted that he had not destroyed the uterus, but had later submitted it for analysis. No evidence was presented to indicate confirmation by this analysis of pyometra.

Respondent produced a picture of a uterus allegedly taken from the animal but the picture contained no reference points and was thus useless in determining its size.

The witnesses who testified on behalf of the Respondent were lacking in credibility in that each was of the opinion that it would not be improper procedure to remove a greatly enlarged uterus from an adult German Shepherd through a 6 centimeter incision. In addition, none had any firsthand knowledge of the incidents alleged to have occurred.

Dr. Massa was completely lacking in credibility in that:

a. he admitted lying to the owners of the German Shepherd;

b. he claimed to have performed numerous procedures and to have administered numerous types of medication which were not reflected on the statement of charges for the animal; and,

c. he was of the opinion that it would not be improper procedure to remove a greatly enlarged uterus from an adult German Shepherd through a 6 centimeter incision.

The Committee finds that the Department has proved by clear and convincing evidence that Dr. Massa's conduct sub-

stantially deviated from an acceptable standard of veterinary care in that:

a. Dr. Massa removed a uterus without evidence that the uterus was infected.

b. Gross and histological findings indicate that the uterus which was removed was normal.

c. The symptoms described by Dr. Massa are inconsistent with a closed pyometra in that that discharge described by Dr. Massa would be indicative of an open pyometra. Thus Dr. Massa either misinterpreted the symptoms, or they did not occur as Dr. Massa reported.

d. It would have been impossible to remove a uterus the size described by Dr. Massa through a 6 centimeter incision and even to attempt to do so would be grossly improper.

e. Dr. Massa's conduct unnecessarily endangered the health of the animal.

f. Dr. Massa knew that the animal was in respiratory distress, yet he failed to perform simple procedures, e.g., a chest tap, to evaluate the extent of the problem before deciding whether to perform surgery.

g. There was no showing of a need to perform certain procedures which were performed, i.e., catheterization and irrigation of the bladder.

h. Dr. Massa's testimony regarding the examination, diagnosis, medication administered, surgical procedures, findings and interaction with the client reveal significant gaps in his understanding of veterinary medical procedure, and a glaringly obvious deviation from an acceptable standard of veterinary care.

The Committee concludes as a result of the above findings of fact, that Respondent is guilty of gross malpractice in the treatment of Palamor's Charlie of Merivern.

The Committee recommends to the Director of the Department of Registration and Education that the Certificate of Registration of Dr. Maynard Lee Massa be revoked."

The Department adopted the findings and recommendations of the Committee and revoked plaintiff's license under count I.

"The findings and conclusions of the administrative agency on questions of fact are to be held prima facie true and correct. [Citation.] It is not the function of the reviewing court to reweigh the evidence or make independent determinations of fact. [Citation.] In reviewing an agency's action, the court must decide whether the

agency's determination is against the manifest weight of the evidence." *McCabe v. Department of Registration and Education* (1980), 90 Ill. App. 3d 1123, 1132, 413 N.E.2d 1353, 1360, *cert. denied* (1981), 454 U.S. 838, 70 L. Ed. 2d 119, 102 S. Ct. 143.

The Department's finding that plaintiff was guilty of gross malpractice is against the manifest weight of the evidence. The dog was brought to plaintiff on a holiday weekend, and plaintiff began caring for the animal at a time when the owner could find no other veterinarian available. Plaintiff recognized the dog had lung difficulty and his use of a certain drug to treat this difficulty was labeled as acceptable treatment by Dr. Petkus, the Department's expert, although Dr. Petkus said he would have also taken X rays and drained fluid from the lung. Plaintiff had no X-ray equipment available in his office, and did not think the dog could survive the trip to the nearest X-ray facility 20 miles away.

Dr. Petkus also stated that pyometra can be very difficult to diagnose, that the disease was subtle, and that at the time plaintiff treated the dog surgery was the only viable treatment. He testified that many of the symptoms shown by the dog were consistent with both lung difficulty and pyometra. He also stated that if a dog has pyometra and the uterus was about to burst, surgery to remove the uterus should be done before treatment of the lung problem. Plaintiff testified he did treat the lung problem immediately with medication.

We need not decide whether plaintiff's conduct amounted to malpractice. The Department found plaintiff guilty of *gross* malpractice under section 12(14) of the Veterinary Medicine and Surgery Practice Act. (Ill. Rev. Stat. 1983, ch. 111, par. 6913(14).) Some meaning must be given to the term "gross," and at a minimum it means something more than malpractice alone. While there is a question whether the conduct here could be considered malpractice due to the expert testimony on both sides that pyometra is difficult to diagnose (see *Spike v. Sellett* (1981), 102 Ill. App. 3d 270, 274, 430 N.E.2d 597, 600), we cannot find the conduct constituted anything greater than malpractice.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

WELCH, J., concurs.

KARNS, J., dissenting:
The findings of the Veterinary Examining Committee, composed

of five practicing veterinarians, while challenged by Dr. Massa, have not been found to be against the manifest weight of the evidence. These findings, adopted by the Department, stated in detail in the majority opinion, were within the expertise of the administrative body to determine, under well-established principles of administrative law. (*Ray v. Department of Registration & Education* (1981), 94 Ill. App. 3d 1123, 419 N.E.2d 413; *Hofmeister v. Department of Registration & Education* (1978), 62 Ill. App. 3d 777, 379 N.E.2d 383; *McKey & Poague, Inc. v. Stackler* (1978), 63 Ill. App. 3d 142, 379 N.E.2d 1198.) It has been established, accordingly, that Dr. Massa performed an absolutely unnecessary operation on a dog without any evidence of uterine infection and that the dog died of pneumonia.

Based upon these detailed findings of fact, it was also within the expertise of the Veterinary Examining Committee to conclude that the doctor was guilty of gross malpractice. This conclusion was supported by the expert testimony of Dr. Helland.

The trial court and this court have substituted their opinion of *gross* malpractice for that of the Veterinary Examining Committee, while acknowledging that the conduct of the doctor may have been negligent, that is, guilty of ordinary malpractice. While the term gross malpractice is not defined by statute, it has been established that it has a common meaning among veterinarians and is not constitutionally vague. (*Ray v. Department of Registration & Education* (1981), 94 Ill. App. 3d 1123, 419 N.E.2d 413.) It is not necessary, indeed impossible, for the legislature to define with particularity every act that would constitute gross malpractice. The court should give great weight to the administrative agency's determination of the legal effect of such statutory standards. (*McKey & Poague, Inc. v. Stackler* (1978), 63 Ill. App. 3d 142, 379 N.E.2d 1198; *Bruns v. Department of Registration & Education* (1978), 59 Ill. App. 3d 872, 376 N.E.2d 82.) This standard has been delegated to the agency for its determination and unless clearly erroneous, the court, having no expertise in the matter, should defer to the discretion of the agency in its interpretation of that standard.

I am left with the feeling that the court would have imposed a more lenient sanction; but it is not for the court to decide what penalty is appropriate unless the penalty imposed is clearly unrelated to the purpose of the statute. *Sutton v. Civil Service Com.* (1982), 91 Ill. 2d 404, 438 N.E.2d 147.

The decision of the Department revoking appellee's veterinary license should be affirmed.