(No. 62988.—

MAYNARD LEE MASSA, Appellee, v. THE DEPART-
MENT OF REGISTRATION AND EDUCATION,
Appellant.

*Opinion filed April 2, 1987.—Rehearing
denied June 5, 1987.*

Neil .F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Edward M. Kay, Assistant Attorney General, of Chicago, of counsel), for appellant.

Thomas A. LeChien, of LeChien & Associates, Ltd., of Belleville, for appellee.

JUSTICE SIMON delivered the opinion of the court:

The Department of Registration and Education instituted an administrative procedure under section 12 of the Veterinary Medicine and Surgery Practice Act seeking the suspension or revocation of Dr. Maynard Lee Massa's license to practice veterinary medicine because of alleged instances of gross malpractice (Ill. Rev. Stat. 1981, ch. 111, par. 6913(14)) and false or misleading advertising. (Ill. Rev. Stat. 1981, ch. 111, par. 6913(9)). Following an administrative hearing, the Veterinary Ex-

amining Committee recommended that Dr. Massa's license be revoked because of his gross malpractice in the treatment of an 18-month-old female German Shepard, Palamor's Charlie of Merivern (Charlie), and that he be reprimanded for his false and misleading advertising. Those recommendations were adopted by the Department. Dr. Massa sought judicial review of the gross malpractice finding and resulting license revocation in the circuit court of St. Clair County, and the circuit court reversed the Department's finding of gross malpractice as a conclusion against the manifest weight of the evidence. The appellate court affirmed (139 Ill. App. 3d 202), and we allowed the Department's petition for leave to appeal (103 Ill. 2d R. 315(a)).

John Drexler and Patricia Turrise were Charlie's co-owners, and Charlie was in Drexler's possession on Saturday night, May 24, 1980, when Drexler noticed that Charlie was listless and had no appetite. The following morning, Charlie's condition showed no improvement, and the dog registered a body temperature of 105 degrees, four degrees above normal. Unable to contact his regular veterinarian, Drexler took Charlie to Dr. Massa at the Tinley Park Animal Hospital and left her there. According to Drexler, he received a call from Dr. Massa the following day indicating that surgery was necessary to save the dog's life, and Drexler gave his consent with the understanding that because her owners intended to breed her, Charlie's reproductive organs should be removed only if absolutely necessary. Drexler then telephoned Turrise, a veterinary technician, and she told Drexler to withdraw his consent at once. Drexler immediately contacted Dr. Massa by phone, but Dr. Massa informed him that Charlie was undergoing surgery at that time. Drexler claims to have asked that any body organs removed be saved, to which Dr. Massa purportedly replied: "I am not a machine shop. I don't save parts."

The evidence establishes that Dr. Massa removed Charlie's uterus and ovaries through a 6-centimeter ventral midline incision just posterior to the umbilicus. Charlie died the next day.

Upon learning of Charlie's death, Turrise called the Tinley Park Animal Hospital and spoke to Dr. Massa, who informed her that the reproductive organs had to be removed because of pyometra (an accumulation of pus in the uterus). According to her testimony, which Dr. Massa denied, Turrise asked to see the removed organs, but Dr. Massa said that they had been discarded in the trash and professed sorrow that no request to save the organs had been made earlier. Turrise then offered to go through the trash herself to find the uterus, but, she testified, Dr. Massa then became irate, saying "you can't have it. I burned it." At the hearing, Dr. Massa testified that he refrigerated the uterus and turned it over to the University of Illinois diagnostic laboratory later that summer as instructed by his insurance carrier. Dr. Massa did not offer any evidence as to the conclusions reached by that facility or even any proof that the uterus had been disposed of as claimed.

The owners arranged for a necropsy to be performed upon Charlie's body by Advanced Veterinary Laboratories. That procedure was conducted by Dr. Gregory Petkus, who testified at the hearing. Dr. Petkus found that Charlie had been in overall good health, with a good coat and no signs of emaciation, but she had suffered from pyothorax, with pleurisy and pneumonia at the time of her death. There were 250 milliliters of purulosanguineous fluid in the right lung; the lung was 50% to 75% covered with abscesses. Both lungs showed evidence of hemorrhaging and edema, and the trachea and bronchia were filled with a frothy fluid. Dr. Petkus concluded that Charlie's death was caused by these thoracic conditions.

Dr. Petkus also examined Charlie's abdominal cavity and concluded upon a gross examination of tissues which had surrounded the uterus that Charlie's uterus could not have been swollen to three times its normal size, filled with pus and ready to rupture as Dr. Massa claimed. Had such conditions existed, Dr. Petkus testified, the arteries and veins leading to both the ovaries and cervix would have been enlarged, as would have been the blood vessels and fatty ligaments around the uterus. Dr. Petkus said, however, that all those tissues appeared of normal size when he examined Charlie's cadaver. Additionally, there was no blood in the abdomen, as would be expected from the removal of an enlarged uterus without ligating the engorged blood vessels. In sum, Dr. Petkus found this to have been a well-performed surgical removal of a healthy uterus.

According to Dr. Petkus, Charlie's lung condition was discernible in a routine examination, without the use of radiographs. (Tinley Park Animal Hospital did not have X-ray equipment, and Dr. Massa claimed that Charlie could not have survived the 20-mile trip to the nearest available X-ray facility.) Proper treatment would include immediate antibiotic therapy, using an antibiotic effective against a broad spectrum of infections. A chest tap should be used to drain the chest of fluids, and the removed fluids should be analyzed to isolate the type of infection for prescription of more effective antibiotics. Dr. Massa indicated that he gave Charlie aziomycin, which Dr. Petkus said to be acceptable but not a broad-spectrum antibiotic. There was no evidence that Dr. Massa administered a chest tap. Moreover, Dr. Petkus testified that steroids should not be given until after it is determined that fungus is not involved in the chest condition. Aziomycin contains steroids.

Dr. David Helland, an author and lecturer in veterinary clinical pathology who has practiced his specialty in

Cook County, conducted a histologic examination of tissue samples taken from Charlie's thoracic and abdominal cavities. In his opinion, Charlie suffered from an overwhelming disease of her respiratory system. His examination disclosed no evidence of disease to her reproductive organs. In Dr. Helland's opinion, Dr. Massa's treatment in this case deviated from the standard of care in south suburban Cook County, and the failure to accurately diagnose Charlie's condition amounted to gross malpractice.

Two veterinarians testified for Dr. Massa. Both indicated that if a pyothorax and pyometra existed, and if the uterus appeared to be in danger of rupturing, the uterus should be surgically removed without delay, notwithstanding the risks of complication caused by the chest condition, because of the danger of peritonitis if the uterus ruptured in the animal. They also testified that a greatly enlarged uterus could be removed through a 6-centimeter incision using the "balloon" method: because the uterus would be filled with fluid, it could be manipulated to be removed lengthwise by extracting one end of the uterus first, forcing the fluid through the uterus to the extracted end, then removing the remainder of the uterus. However, members of the Veterinary Examining Committee who were present at the hearing questioned the wisdom of such a procedure, indicating that there was no reason not to enlarge the incision to accommodate a swollen uterus.

Dr. Massa testified in his own behalf, recalling symptoms and treatment almost solely from memory. He claimed that the Tinley Park Animal Hospital had possession of the medical file (Dr. Massa had since moved to Belleville), and although requested to locate and produce the file, it had been unable to do so. Yet, Dr. Massa was in possession of two unmarked photographs supposedly depicting both Charlie's cadaver and the greatly en-

larged uterus he had removed from the dog. There were no reference aids in the uterus photograph to help determine the size of the pictured organ.

According to Dr. Massa, Charlie was mistreated by her owners. She was severely underweight and her coat was in poor condition. He said pus was observable in Charlie's vaginal discharge, indicating uteral infection. Dr. Petkus found no evidence of pus discharge during the necropsy, and he testified that pus would not discharge through the cervix unless the pyometra was already open.

After stabilizing Charlie Sunday night, Dr. Massa performed surgery and claimed to have discovered that Charlie's uterus was enlarged to three times its normal size and in danger of rupturing. Dr. Massa disputed Dr. Petkus' testimony that the incision was only 6 centimeters in length, but if that were in fact the case, Dr. Massa claimed to have successfully extracted the uterus using the "balloon" method. He did not recall draining any fluids from Charlie's chest.

Upon reviewing the evidence adduced at the administrative hearing, the Veterinary Examining Committee came to the following conclusions:

"Dr. Massa was completely lacking in credibility in that:

a. he admitted lying to the owners of the German Shepard;

b. he claimed to have performed numerous procedures and to have administered numerous types of medication which were not reflected on the statement of charges for the animal; and,

c. he was of the opinion that it would not be improper procedure to remove a greatly enlarged uterus from an adult German Shepard through a 6 centimeter incision.

The Committee finds that the Department has proved by clear and convincing evidence that Dr. Massa's

conduct substantially deviated from an acceptable standard of veterinary care in that:

a. Dr. Massa removed a uterus without evidence that the uterus was infected.

b. Gross and histological findings indicate that the uterus which was removed was normal.

c. The symptoms described by Dr. Massa are inconsistent with a closed pyometra in that the discharge described by Dr. Massa would be indicative of an open pyometra. Thus Dr. Massa either misinterpreted the symptoms, or they did not occur as Dr. Massa reported.

d. It would have been impossible to remove a uterus of the size described by Dr. Massa through a 6 centimeter incision and even to attempt to do so would be grossly improper.

e. Dr. Massa's conduct unnecessarily endangered the health of the animal.

f. Dr. Massa knew that the animal was in respiratory distress, yet he failed to perform simple procedures, e.g., a chest tap, to evaluate the extent of the problem before deciding whether to perform surgery.

g. There was no showing of a need to perform certain procedures which were performed, i.e., catheterization and irrigation of the bladder.

h. Dr. Massa's testimony regarding the examination, diagnosis, medication administered, surgical procedures, findings and interaction with the client reveal significant gaps in his understanding of veterinary medical procedure, and a glaringly obvious deviation from an acceptable standard of veterinary care.

The Committee concludes as a result of the above findings of fact, that Respondent is guilty of gross malpractice in the treatment of Palamor's Charlie of Merivern."

These findings were adopted by the Department, but the appellate court concluded that a finding of gross malpractice was against the manifest weight of the evidence because experts on both sides had testified that

pyometra was difficult to diagnose, that a uterus ready to burst should be removed without any delay, and because Dr. Petkus had labeled Dr. Massa's drug therapy for the pyothorax acceptable. The appellate court majority reasoned that "[s]ome meaning must be given to the term 'gross,' and at a minimum it means something more than malpractice alone. *** [W]e *cannot find* the conduct constituted anything greater than malpractice." (Emphasis added.) 139 Ill. App. 3d 202, 208.

It is beyond the competency of the circuit, appellate, or supreme court to "find" the presence or absence of gross malpractice as contemplated by the Act. That function has been delegated by the General Assembly to the Department and its committee of veterinary experts. In *Klafter v. State Board of Examiners of Architects* (1913), 259 Ill. 15, 21-22, this court upheld a statutory provision allowing revocation of an architect's license for "gross incompetency or recklessness," reasoning that "[w]hat actions or conduct of an architect will bring him within the meaning of these words must be left to the sound discretion of the State board *** and a reasonable discretion reposed in the officials charged with its enforcement." In accordance with that decision and the strictures of the Administrative Review Law, the Department's findings in this case may be disturbed only upon Dr. Massa's showing that they are against the manifest weight of the evidence. Ill. Rev. Stat. 1983, ch. 110, par. 3—110; *Parker v. Department of Registration & Education* (1955), 5 Ill. 2d 288, 294.

We have examined the record and are of the opinion that the committee's decision was not against the manifest weight of the evidence. While a uterus as near to bursting as that which Dr. Massa claims to have found inside Charlie might require immediate surgery, there is ample evidence to conclude that Charlie suffered no symptoms indicating the existence of pyometra, rather

than pyothorax, pleurisy and pneumonia. Even conceding that pyometra is difficult to diagnose, Dr. Massa must have been aware that pyometra was not present upon gross examination of the reproductive organs after opening the abdominal cavity, yet he performed an ovariohysterectomy which the evidence indicates to have been wholly unnecessary. The size of the incision belies Dr. Massa's assertion that he removed a swollen uterus; the post-mortem examination shows there to have been no pyometra; and Dr. Massa's failure to produce the results of forensic examination by the University of Illinois raises an inference that the results—if there were any—would not have favored his case. (See *Rector v. Rector* (1846), 8 Ill. 105, 120; *Dollison v. Chicago, Rock Island & Pacific R.R. Co.* (1976), 42 Ill. App. 3d 267, 277.) These facts and inferences adequately substantiate the committee's conclusion.

Arguing that malpractice is simply another word for the negligent performance of professional services, Dr. Massa would draw the standards identifying gross malpractice from cases defining gross negligence. Citing *Keehn v. Braubach* (1940), 307 Ill. App. 339, Dr. Massa says that gross negligence is characterized by wilful and wanton action and is synonymous with recklessness. *Keehn* did not, however, equate gross negligence with recklessness, but rather followed the decisions of other jurisdictions in holding that, as used in the guest statute, gross negligence is a "misnomer" which actually describes wilful and wanton misconduct. (307 Ill. App. 339, 355-56.) Thus, *Keehn* does not provide meaningful guidance in this case.

The meaning of a specific statutory provision is derived from an examination of the language and purpose of the legislation as a whole. (*Miller v. Department of Registration & Education* (1979), 75 Ill. 2d 76, 81.) By enacting the Veterinary Medicine and Surgery Practice

Act, the General Assembly hoped to insure that only qualified individuals would practice veterinary medicine within the State, and section 12 of the Act authorizes the revocation of a license where the individual has demonstrated that he is unqualified. If section 12(14) were construed to allow revocation only upon showing the wilful and wanton dispensation of inadequate care, the public would no longer be protected from licensed but incompetent providers. Clearly, the legislature cannot have intended to allow veterinarians to continue to practice even where they have exhibited a "glaringly obvious deviation from an acceptable standard of veterinary care" such as the Veterinary Examining Committee found in this case. Furthermore, where the legislature has clearly expressed its intentions the court will construe the words used according to their ordinary meaning. (*Finley v. Finley* (1980), 81 Ill. 2d 317, 326.) Gross negligence is commonly understood to encompass "very great negligence, \*\*\* [b]ut it is something less than the willful, wanton and reckless conduct" Dr. Massa claims it to be. (Black's Law Dictionary 932 (5th ed. 1979).) For these reasons, the statute must be construed to allow revocation of Dr. Massa's veterinary license upon a showing of great negligence in the performance of his veterinary practice; recklessness need not be established.

The record in this case is plainly sufficient to support the Department's determination of gross malpractice in that Dr. Massa ignored the serious nature of Charlie's lung condition and proceeded to remove reproductive organs which, at least at the time of surgery, he knew or should have known to have been healthy. According to Dr. Massa, revocation of his license on these facts is overly harsh considering that he has been a licensed veterinarian since 1965 and that the record does not disclose any other incidents of malpractice. Dr. Massa was,

however, reprimanded for four acts of false and misleading advertising.

While revocation of a veterinary license is a harsh sanction that will deprive Dr. Massa of his livelihood, it is the administrative agency, and not the judiciary, which bears the responsibility to determine sanctions for individual cases necessary to protect the public and its property. We defer to the Department's expertise and experience and are reluctant to tamper with its decision revoking a license unless that decision is against the manifest weight of the evidence. Dr. Massa relies upon *Citrano v. Department of Registration & Education* (1980), 90 Ill. App. 3d 937, where the appellate court held that the Department arbitrarily revoked a barber's license where the barber had lied on his application. Because there was no question of the barber's competence or honest dealing with the public, *Citrano* is inapposite to this case. The facts here establish that Dr. Massa presents a risk to his patients and is dishonest with his customers, and the Department's decision revoking his license cannot be considered against the manifest weight of the evidence. (*People ex rel. Stephens v. Collins* (1966), 35 Ill. 2d 499; see *Sutton v. Civil Service Com.* (1982), 91 Ill. 2d 404.) The judgments of the appellate and circuit courts are accordingly reversed, and the order of the Department of Registration and Education is affirmed.

*Judgments reversed;*
*order affirmed.*