**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**John R. GRAVEE, Jerome A. Maher, Donald J. Porth, Edward J. Williams, Robert B. Merrifield, I. Robert Ballin, Thomas O'Boyle, Richard A. Samuels, and Patrice D. White, as independent executor of the Estate of William T. White, Jr., Defendants.**

No. 94 C 4589.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 15, 1997.

Order Supplementing Decision
Jan. 15, 1997.

See also 1996 WL 494251.

Judi A. Lamble, Fay Clayton, Steven A. Ramirez, Robinson, Curley & Clayton, Chicago, IL, Steven A. Hammond, Jeffrey R. Coleman, Scott A. Kamber, Hughes, Hubbard & Reed, New York City, for Plaintiff.

Camillo F. Volini, Chicago, IL, for Gravee, Maher, and Williams.

Robert W. Tarun, Thomas R. Bearrows, Bruce R. Braun, Winston & Strawn, Chicago, IL, for Porth.

Vincent J. Connelly, Javier H. Rubinstein, Mayer, Brown & Platt, Chicago, IL, Merrifield, Ballin, O'Boyle and Samuels.

## MEMORANDUM OPINION AND ORDER

MILTON I. SHADUR, Senior District Judge, sitting by designation.

This action has spawned several pending motions that are ripe for decision. Federal Deposit Insurance Corporation ("FDIC") has moved to dismiss defendants' Counterclaim against it.[1] All defendants have brought motions for summary judgment on FDIC's gross negligence claim against them. In addition, certain defendants seek to strike certain exhibits submitted by FDIC in opposition to the summary judgment motions. For the reasons stated in this memorandum opinion and order, FDIC's motion to dismiss the Counterclaim is granted, the motions to strike are denied and the motions for summary judgment are denied.

### Facts [2]

### FDIC's Claim

Horizon Federal Savings Bank ("Horizon") was a federally chartered and federally insured mutual savings and loan association headquartered in Wilmette, Illinois. It had branches throughout the Chicago metropolitan area. John Gravee ("Gravee") was Horizon's President, Chief Executive Officer and Chairman of the Board of Directors ("Board"); Jerome Maher ("Maher") was Horizon's Chief Operating Officer and Vice Chairman of its Board; and Donald Porth ("Porth"), Robert Merrifield ("Merrifield"), I. Robert Ballin ("Ballin"), Thomas O'Boyle ("O'Boyle") and William White, Jr. ("White") (collectively "Outside Directors") were the remaining members of Horizon's Board together with two other outside directors, Richard Samuels ("Samuels") and Edward Williams ("Williams"). All defendants except

Gravee and Maher were members of Board's loan committee from 1983 to 1990, except that Samuels resigned from Horizon's Board at the end of 1985.

In early 1982 Horizon (then known as First Federal Savings and Loan Association of Wilmette [3]) was approached by officials of Federal Home Loan Bank Board ("FHLBB") and Federal Savings and Loan Insurance Corporation ("FSLIC") with the proposal that Horizon merge with Glenview Guaranty Savings & Loan Association ("Glenview"), Evergreen Savings & Loan Association ("Evergreen") and Lincoln Square Federal Savings & Loan Association ("Lincoln Square"). Glenview, Evergreen and Lincoln Square were all experiencing serious financial difficulties and would cease to operate without a merger with a solvent institution. On the basis of certain agreements with and forbearances by FHLBB and FSLIC, Horizon's Board approved the mergers, although absent the forbearances the resulting institution would have been insolvent from the moment of its creation.

Before 1984 Horizon had long-standing relationships with two mortgage brokerage firms, Markham Sellers & Mony ("Markham") in Phoenix and Tucson, Arizona, and McKay, McManamon & Maguire ("McKay") in Sarasota, Florida. For some years those business relationships had been limited to residential mortgages and condominium conversions, which had been profitable for both Horizon and the brokers. Beginning in 1984 defendants, as Horizon's loan committee, approved a number of "acquisition, development and construction" loans ("ADC loans") submitted by Markham and McKay for commercial real estate projects in Arizona and Florida, types of loans that carried with them both greater risk and the possibility of greater return than residential mortgages.

---

1. FDIC was substituted as plaintiff after original plaintiff Resolution Trust Corporation ("RTC") ceased to exist by statute on December 31, 1995.

2. Because FDIC's Fed.R.Civ.P. ("Rule") 12(b)(6) motion targeting defendants' Counterclaim requires a pro-defendants perspective while defendants' Rule 56 motions demand an opposite stance, the section of the text that follows seeks

to make clear the areas where the parties' versions part company. Any material differences will be addressed in the course of the substantive discussion.

3. Although the corporate name was changed in 1983, for clarity's sake the institution is referred to throughout this opinion as Horizon, even as to events that occurred before the name change.

Among others, those projects included Tidy Island, a residential condominium project on an island off the coast of Sarasota that, although initially approved in 1984, had additional commitments of more than $3 million approved in 1985; Agua Dulce in Tucson, a raw land development project that, although originally approved in 1984, had additional commitments of more than $7.5 million during 1986 and 1987; La Buena Vida in Glendale, Arizona (a suburb of Phoenix), a project to convert undeveloped land into improved lots for which commitments of more than $15 million were approved in 1987 and 1988; Power Road Medical Center in Mesa, Arizona, a medical building project approved in 1985 for an initial commitment of more than $5 million; and a working capital line of credit to Markham, $2 million of which was approved in 1985. All of those loans are at issue in this case.

FHLBB performed annual examinations of Horizon's operations. Its 1984 examination report, which Horizon received in February 1985, contained serious criticisms of Horizon's practices in connection with the ADC loans, including Horizon's reliance on Markham and McKay, its lack of underwriting and monitoring procedures and its lack of written policies regarding underwriting and monitoring. Specifically, the examiners concluded that Horizon had approved ADC loans even when it had failed to verify information submitted by the brokers with the loan applications, including information regarding the borrower's financial status, and had failed to obtain such basic information as appraisals on the property in question. Among other things, the 1984 examination report (D. Ex. 30 at 2.6—2.7) [4] said,

> Since the previous examination report of December 14, 1983, the savings bank has funded 31 brokered loans totaling approximately $57,000,000. The loans in question are primarily development and construction loans which by their very nature carry a higher-than-average degree of risk.
>
> [T]he association is not employing prudent loan underwriting procedures in regards to

lending policies, credit analysis, loan·approval, appraisals, and disbursements.... While policies and standards are available for residential and apartment loans, there are none in place for the types of loans being originated through the two brokers.

\*　　\*　　\*　　\*　　\*　　\*

Vice President Thomas Wallace [5] said that there was no need to verify the personal financial statements because the mortgage loan brokers handle that.

In addition the letter from the supervisory agent that accompanied the examination report stated (D. Ex. 29 at 2):

> This office is disturbed by the volume of these types of loans already in the portfolio and the serious nature of the documentation deficiencies noted by the examination staff.

\*　　\*　　\*　　\*　　\*　　\*

> [I]t appears that the savings bank is relying to a large extent on loan brokers to perform basic loan underwriting and recordkeeping functions.

That letter also addressed specific problems with Horizon's practices (id. at 3), recommending among other things that written underwriting policies for ADC loans be adopted (id.). It noted that failure to obtain appropriate documentation such as applications, credit reports and title policies before approving loans was "an unsafe and unsound business practice" (id.). It asked that defendants ensure that properly completed appraisals were obtained and reviewed in a timely manner and stated that in FHLBB's opinion an appraisal done at the request of a prospective borrower was not acceptable for underwriting purposes (id.).

To return to the 1984 examination report, the examiners there also criticized several aspects of the Tidy Island project, including the lack of documentation of personal and corporate financial statements (D. Ex. 30 at 2.12), the inadequacy of the appraisal (id.) and the lack of timeliness of the appraisal (id.). As to the Agua Dulce project, the

---

**4.** Merrifield, Ballin, O'Boyle and White submitted the exhibits cited here as "D. Ex.—."

**5.** He ("Wallace") was Vice President of Horizon's construction loan department, which was responsible for ADC lending.

examiners found among other things that Horizon had funded 100% of the purchase price (*id.* at 2.15), that interest reserves would be exhausted half-way through the life of the loan (*id.*), that the borrowers had no personal liability (*id.*), that there were several serious problems with the appraisal (*id.* at 2.16) and that there was no record of the loan approval (*id.* at 2.18).

As a result of those perceived deficiencies, in October 1984 (even before Horizon was given the examination report) FHLBB requested that Horizon temporarily cease approving out-of-state broker-originated ADC loans, a constraint to which Horizon agreed. FHLBB did not authorize Horizon to resume such lending until May 1985, and that authorization was conditioned on certain limitations in both the amount of assets Horizon could commit to such loans and the amount of the loans themselves.

In a written response to the 1984 report (D.Ex. 32), Horizon's Board (now defendants) took strong exception to many of the most serious criticisms leveled at Horizon's underwriting and monitoring practices. In part the response said:

> We do not agree with the current examiners' evaluation of the safety and soundness of said loans, nor do we agree that there is any lack of documentation. We ask that another examination of these loans be made as soon as possible to resolve the conflicting reports.
>
> \* \* \* \* \* \*
>
> The Bank's [lending] policies are set out in the minutes as part of the standard resolutions which are approved and revised on a yearly basis.... We do not agree that there has been a problem regarding our lending policies.
>
> \* \* \* \* \* \*
>
> The pertinent issue is whether adequate documentation was available both from the mortgage banking firm that originated the loans and from the lending officers of Horizon for the Board of Directors to make a judgement regarding the soundness of the investment. We do not agree that adequate documentation was not available.
>
> \* \* \* \* \* \*

> [W]e consider the allegation made by the examiner that the documentation is not adequate to be a serious misstatement of fact.
>
> \* \* \* \* \* \*
>
> The examiner's criticism of certain of the appraisals in the Bank's loan files is unwarranted.
>
> \* \* \* \* \* \*
>
> We believe the loans originated by the two mortgage banking firms in Phoenix and Sarasota contributed to the significant progress [in profitability] that has been made in the past two years.
>
> \* \* \* \* \* \*
>
> We strenuously object to the criticism reflected in the examination. The opinions expressed by the examiners are not warranted. The facts, as set out by the examiners, are not correct.

Next FHLBB conducted a special examination in July 1985 to review only the ADC loans approved between May and July of that year. David Kalina ("Kalina") was assigned as the supervisory agent for Horizon, a position in which he remained until 1989. Kalina's report concluded that the underwriting procedures Horizon had utilized in connection with those loans were satisfactory. Similarly, an annual examination report dated December 1985 did not repeat the criticisms that had been made in 1984.

FHLBB's next annual examination took place in 1987. Once again the report (D.Ex. 47) found serious deficiencies in Horizon's ADC loan underwriting and monitoring practices. Kalina's letter accompanying the report (D.Ex. 46) stated:

> The examination report indicated that the association had outstanding commitments of $55.4 million on construction loans purchased from [Markham] and aggregate outstanding loan balances on these loans was $30.5 million as of February 28, 1987. In addition, the institution had outstanding commitments of $7.2 million with aggregate outstanding balances of $6.1 million on construction loans purchased from [McKay] as of the same date. These loan

concentrations are of supervisory concern since not only has the association failed to maintain adequate monitoring procedures for construction loans purchased from brokers, but [Markham] are the brokers for four of the construction loans which have been classified as substandard assets and the fifth loan classified as substandard is a working line of credit with [McKay]. We request that the board cease granting any further commitments to [Markham] and [McKay] until it can verify that an improvement in the association's documentation, underwriting, and monitoring procedures with regards to construction loans purchased from brokers.

As for the report itself, it found problems with inadequate monitoring, lack of documentation and excessive reliance on loan brokers (D. Ex. 47 at 2); with Gravee's plan to alter the paper status of the Agua Dulce loan to improve Horizon's books (*id.* at 3); with the outdated appraisal, the lack of borrower equity and the "good potential for loss" on Agua Dulce (*id.* at A–12.5); and with the slow sales and lack of a current appraisal on Tidy Island (*id.* at A–13.1).

Once again defendants rejected the criticisms in responding to the examination report. Their letter to Kalina said, among other things (D. Ex. 53 at 2, 5):

> The Board does not agree with the opinions expressed in your letter with regard to the management of construction lending, broker relations, the quality of the Bank's assets, or lending in the Florida and Arizona areas. The documentation required by Section 563.17–1(c)(1) has been complied with on all construction loan files.
>
> \* \* \* \* \* \*
>
> Management does not agree with the Supervisory Agent that there is any undue concentration of loans in either Florida or Arizona.

FHLBB conducted two more annual examinations in 1988 and 1989. Each year's report echoed the criticisms of the 1984 and 1987 examinations.

In 1988 the examination report (D.Ex. 60) found a lack of appraisal policies (*id.* at 2); an out-of-date appraisal on Tidy Island (*id.*);

problems with the appraisals of Agua Dulce (*id.* at A–13.2); "material concerns" about the Power Road Medical Center project (*id.* at A–13.5 to A–13.6); difficulty with the fact that nearly half of the entire amount outstanding on ADC properties in Arizona consisted of "criticized assets" (*id.* at A–14.1 to A–15.4); and regulatory violations regarding appraisals (*id.* at A–26.1). Although defendants responded to the examination report, their response (D.Ex. 63) did not contest the examiner's conclusions as earlier responses had.

FHLBB's 1989 examination report (P.Ex. 38) criticized Horizon's relationship with Markham (*id.* at 1–a–3); noted the lack of support for the La Buena Vida loans (*id.* at 2–a to 2–a–1); criticized the Power Road Medical Center loan and appraisal (*id.* at 2–a–6); said "it [was] unclear why bank management chose to proceed with [Agua Dulce]" (*id.* at 2–a–13 to 2–a–14); and criticized Tidy Island (*id.* at 2–a–16 to 2–a–17). Because the appointment of RTC as receiver (referred to later) intervened, Horizon had no opportunity to respond to that report.

In addition to conducting the annual examinations, FHLBB engaged in an annual review of Horizon's business plans. From the time of the merger until Horizon was placed in receivership, FHLBB always approved those business plans.

In 1989 Congress enacted FIRREA, which altered the existing regulatory structure and, most importantly to this case, did away with the recognition of supervisory goodwill to meet capital requirements. Without its supervisory goodwill, Horizon immediately fell below the capital requirements. Hence, on January 11, 1990 the Office of Thrift Supervision ("OTS") declared Horizon insolvent and appointed RTC as receiver. At that time 69.5% of Horizon's substandard or classified assets were the result of loans brokered by Markham, and 93% of Horizon's substandard or classified assets were in Arizona or Florida.

RTC filed this action on July 27, 1994, asserting that between 1985 and 1988 defendants were grossly negligent in carrying out their duties as Horizon's directors and offi-

cers. In relevant part the Complaint alleges that for each of the doubtful loans defendants relied almost exclusively on Markham and McKay to perform the underwriting, failed to verify the information submitted by the brokers and failed to monitor the loans. Horizon allegedly lost in excess of $50 million on those loans.[6]

### Defendants' Counterclaim

To induce Horizon to approve the mergers with Glenview, Evergreen and Lincoln Square in 1982, FHLBB and FSLIC agreed to grant Horizon certain forbearances and assurances for a period of not less than five years. Those agreements included:

1. FHLBB's waiver of Horizon's net worth requirements;

2. FHLBB's waiver of Horizon's liquidity requirements;

3. FSLIC's agreement to issue income capital certificates when requested by Horizon if necessary to meet Horizon's regulatory capital requirements, to ensure public confidence in Horizon and to meet Horizon's borrowing requirements or to satisfy accepted accounting standards; and

4. the FHLBB–FSLIC agreement that Horizon would be permitted to elect to benefit from any newly-authorized regulations or laws relating to savings and loan institutions.

FHLBB and FSLIC also agreed that the supervisory goodwill created by the merger could be treated by the new institution as an asset to satisfy its regulatory capital requirements. Lacking that, Horizon would have been insolvent at the time of the merger. It was also agreed that the supervisory goodwill could be amortized over a period of forty years. Finally, Horizon and FHLBB agreed that O'Boyle would serve on Horizon's Board as an FHLBB representative. Defendants, each of whom became a director of the newly-formed institution, allege that they would not have agreed to serve as directors without those agreements and assurances.

With those terms and conditions in place, FHLBB and FSLIC accepted Horizon's merger application. As a result Horizon entered into March 1982 merger agreements with Glenview, Evergreen and Lincoln Square. About November 5, 1982, in reliance upon the agreements with FHLBB and FSLIC, defendants voted to approve the mergers.

Sometime after the mergers were accomplished, OTS became FHLBB's successor and FDIC became FSLIC's successor. For several years Horizon, FHLBB (and later OTS) and FSLIC (and later FDIC) complied with the agreements and assurances, including the recognition of Horizon's supervisory goodwill as an asset for the purpose of determining its compliance with regulatory capital requirements. But in December 1989, as a result of the enactment of FIRREA and a change in OTS' governing regulations, OTS and FDIC refused to continue to allow Horizon's supervisory goodwill (which then exceeded $100 million) to be used to satisfy its capital requirements.

As a consequence, on January 11, 1990 OTS declared Horizon insolvent and appointed RTC as receiver. Outside Directors' Counterclaim alleges that their contracts to serve as Horizon directors were terminated as a result of Horizon's insolvency. They also allege that Horizon was declared insolvent as a result of FDIC's breach of its obligations to Horizon.

### FDIC's Motion To Dismiss Counterclaim

On FDIC's Rule 12(b)(6) motion, all well-pleaded allegations in the Counterclaim must be credited, with all reasonable inferences drawn in counterclaimants' favor (see, e.g., *Sherwin Manor Nursing Center, Inc. v. McAuliffe*, 37 F.3d 1216, 1219 (7th Cir.1994)). Dismissal is proper only if it is clear from the Counterclaim that no set of facts consistent with its allegations would entitle counterclaimants to relief. (*Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984), citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

On June 19, 1995 Outside Directors brought a counterclaim against RTC and

---

**6.** However, the Complaint does not allege that those loans caused Horizon's insolvency in 1989.

third-party claims against FDIC and OTS. Each of those pleadings asserted a breach of contract claim, a promissory estoppel claim and a declaratory judgment claim. In addition, Outside Directors brought a recoupment claim against FDIC, and Porth brought a breach of contract claim for director's fees.

RTC no longer exists, and FDIC is now plaintiff in this action. Hence the third-party complaint against FDIC is dismissed as moot, with the counterclaim against RTC treated as a counterclaim against FDIC.[7] Additionally, Porth's director's fees claim against FDIC has been settled and withdrawn.

With those procedural matters out of the way, this opinion turns to the merits of the motion to dismiss. For that purpose, the relevant arguments raised by both RTC and FDIC will be treated as arguments advanced by FDIC. Here they are:

1. No jurisdiction exists over any claim brought under the Federal Tort Claims Act ("FTCA").

2. In its entirety the Counterclaim is really an action against OTS and should be brought in the Claims Court.

3. No breach of contract claim is sustainable because Outside Directors are not third-party beneficiaries of any agreement between Horizon and FHLBB or FSLIC or both.

4. Outside Directors' promissory estoppel claim lacks merit because no promise was made to them.

5. Their declaratory judgment claim is not appropriate because it essentially duplicates their breach of contract claim.

6. Their recoupment claim fails as a matter of law.

Those issues will be addressed in turn.

Counterclaim ¶ 2 (contained in Count I and incorporated by reference into each of Counts II through IV) alleges that Outside Directors' claims are for money damages or recoupment or alternatively are brought under the FTCA, 28 U.S.C. § 2679.[8] FDIC

urges that Outside Directors have no claim under the FTCA because such claims must be brought against the United States, not against an agency sued in its own name, and because Outside Directors have not exhausted the administrative precondition to such a suit. Outside Directors have not responded.

 Even more fundamentally, both the FTCA's title and its section 2674 make plain that it embraces only tort claims. Exclusive jurisdiction over contract claims for money damages against the United States is vested by the Tucker Act (Section 1491(a)(1)) in the Claims Court. To the extent that such claims are assertable against FDIC, however, the 12 U.S.C. § 1819(a) Fourth "sue or be sued" clause constitutes a waiver of sovereign immunity such as to confer jurisdiction on this district court.

 Outside Directors' claims for breach of contract, promissory estoppel and recoupment all sound in contract. Their declaratory judgment claim must be brought (if at all) under the Declaratory Judgment Act, Section 2201. None of the claims at issue is properly brought under the FTCA. Consequently, all of the Counterclaim's allegations as to the FTCA are stricken.

FDIC next argues that the Counterclaim belongs in the Claims Court as targeting OTS rather than FDIC, because the latter did not breach the alleged agreements or promises at issue and so is not a proper party. As FDIC would have it, it is being sued as successor to FSLIC, which was abolished effective August 9, 1988, while the alleged breach of the agreement with Horizon occurred in December 1989. Thus, FDIC argues, it did nothing that would give rise to liability. Outside Directors counter that FDIC's contention in effect denies allegations in the Counterclaim and is hence impermissible under Rule 12(b)(6). That, however, makes no sense—for the issues posed by the FDIC are a function of certain legal consequences rather than factual allegations. Accordingly the two facets of FDIC's argument will be analyzed on the merits.

---

**7.** Outside Directors' third-party complaint against OTS was dismissed on August 26, 1996. Their claims against OTS have been transferred to the Court of Federal Claims ("Claims Court").

**8.** All further references to Title 28 provisions will take the form "Section—."

First, as to its being sued as successor to FSLIC, FDIC's memorandum acknowledges this chronology: It was in 1982 that FSLIC and FHLBB entered into the supervisory goodwill agreement; it was on August 8, 1988 that FSLIC's assets and liabilities were transferred to the FSLIC Resolution Trust, managed by FDIC; that it was on August 9, 1988 that FSLIC ceased to exist; and that the breach charged by Outside Directors occurred in December 1989. From that sequence FDIC reasons that because FSLIC had no liability for the alleged breach, which had not yet occurred when FSLIC ceased to exist in August 1988, no such liability was transferred to FDIC.

■ But that argument ignores (1) FSLIC's status as a party to the agreement to recognize Horizon's supervisory goodwill and (2) FDIC's inherited responsibility for FSLIC's obligations under that agreement when it took over FSLIC's assets and liabilities in August 1988. If FDIC's position were credited, FSLIC's departure from the scene would trigger a total insulation from liability to Horizon for any future breach of the 1982 agreement: FSLIC could not be liable because it no longer existed, while FDIC could not be liable because it had not made the original promise. That is totally unpersuasive—instead the legal situation post-August 9, 1988 is precisely that of the successorship that applies in any post-merger situation under corporate law. FDIC must be considered as having taken over FSLIC's position warts and all—or in this instance, instinct with the potential for liability to the same extent that FSLIC would have had if it had remained in existence past the December 1989 date of the alleged breach.

■ That leads to the second part of the FDIC's argument, which focuses not on agency successorship but on agency responsibility. FDIC urges that OTS is the proper defendant because that agency and not

FDIC enacted the regulations prohibiting the use of supervisory goodwill to satisfy regulatory capital requirements. In that respect, though, Counterclaim ¶ 16 alleges that "in December 1989, Counter–Defendants [including FDIC] breached their contractual obligations to Horizon and to Counter–Plaintiffs by refusing to recognize Horizon's supervisory goodwill...." Relatedly, Outside Directors' Mem. 16 n. 10 asserts that FDIC participated in the enforcement of the OTS regulations that resulted in RTC's placing Horizon into receivership.[9]

■ There is no dispute here that OTS was the agency empowered by Congress to enact regulations to effectuate FIRREA's provisions that strictly limited the amounts of supervisory goodwill recognizable as capital to satisfy minimum regulatory capital requirements. Nonetheless, at the present pleading stage it must be credited that Horizon was injured by both the enactment and the enforcement of the regulations, for only then was it placed into receivership. FDIC has not argued that Congress left enforcement of the OTS regulations solely to OTS.[10] While this Court may take judicial notice of a federal agency's scope of responsibility, FDIC has not made the necessary showing to permit this Court to conclude that it played no part in the enforcement of the relevant regulations. At least for now, FDIC cannot extricate itself on that basis either.

But Outside Directors are scarcely home free. It will be remembered that the 1982 agreement as to the right to utilize supervisory goodwill to meet capital requirements ran not to them but to Horizon. Last term *United States v. Winstar Corp.*, —— U.S. ——, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) held that Congress and OTS were empowered to alter the regulatory capital requirements for institutions such as Horizon so that

9. While a plaintiff is not permitted to cure gaps in the factual allegations of a pleading in a Rule 12(b)(6) brief (*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)), Outside Directors' assertion that FDIC participated in the enforcement of the OTS regulations is consistent with (albeit more specific than) the allegation in Counterclaim ¶ 16 and may be considered by this Court. FDIC has not argued otherwise.

10. It may well be that FDIC had no responsibility for enforcing the OTS regulations, but FDIC has not made that argument. It has argued only that it did not participate in promulgating the regulations.

supervisory goodwill would no longer be recognized for that purpose, but that institutions damaged by that change in treatment were entitled to damages (*id.* at ——, 116 S.Ct. at 2452). But nothing in *Winstar* hinted at such recovery by anyone other than the institutions themselves. And that is the major hurdle that Outside Directors, who were not the promisees of the 1982 agreement, must overcome.

■ On that score FDIC contends that the Counterclaim's breach of contract claim is not viable because Outside Directors are not third-party beneficiaries of any agreement among FHLBB, FSLIC and Horizon. "Under Illinois law, a person is considered a third party beneficiary only when the benefit to him is intended ..." (*Golden v. Barenborg*, 53 F.3d 866, 870 (7th Cir. 1995)). Incidental beneficiaries may not sue on the contract (*id.*). For that purpose plaintiff's status "is determined by the manifestation of the parties' intent expressed through the language of the contract" (*id.*, citing *Altevogt v. Brinkoetter*, 85 Ill.2d 44, 51 Ill.Dec. 674, 679, 421 N.E.2d 182, 187 (Ill. 1981)). In other words, "the [required intent] must be evidenced by an express provision in the contract identifying the third-party beneficiary" (*Washington Nat'l Ins. Co. v. The Administrators*, 2 F.3d 192, 197 (7th Cir.1993), quoting *Wheeling Trust & Sav. Bank v. Tremco, Inc.*, 153 Ill.App.3d 136, 106 Ill.Dec. 254, 257, 505 N.E.2d 1045, 1048 (Ill.App. 1st Dist.1987)). In addition to the contract's language, the court may also look to the circumstances surrounding the making of the contract to determine the parties' intent (*XL Disposal Corp. v. John Sexton Contractors Co.*, 168 Ill.2d 355, 213 Ill. Dec. 665, 659 N.E.2d 1312, 1316 (1995), citing the seminal decision in *Carson Pirie Scott & Co. v. Parrett*, 346 Ill. 252, 178 N.E. 498 (1931)).

■ Here Outside Directors have alleged that they were intended beneficiaries of the agreement among FHLBB, FSLIC and Horizon to recognize Horizon's supervisory goodwill (Counterclaim ¶ 14). Their Mem. 14 n. 8 makes it clear that they are asserting the existence of a written agreement. But even the direct relationship among the principals is not the product of a formal written contract between FHLBB and FSLIC on the one hand and Horizon on the other. Instead, it is said to be embodied in several documents, which Outside Directors have not identified with any specificity (see, e.g., Counterclaim ¶¶ 8–9). Although it is plain that FHLBB Resolution 82–624 and the merger agreements are among the relevant documents, nothing advanced by Outside Directors tells whether other documents exist as well.

Most importantly for present purposes, the posture of what is before this Court does not call for filling in the gaps that Outside Directors have left open. Nothing in what they have submitted suggests any intent on the part of the original parties to confer third-party beneficiary status upon them. No reasonable inferences from the Counterclaim's allegations, of the type called for by Rule 12(b)(6), cures that deficiency. And so even though *Winstar* confirms the viability of a breach of contract claim for Horizon itself, Outside Directors' third-party beneficiary claim in Count I is dismissed.

■ That conclusion is closely linked to FDIC's next contention that the promissory estoppel claim lacks merit because no promise was made directly to Outside Directors. Promissory estoppel in Illinois calls for a showing of the promisor's unambiguous promise to the promisee, the promisee's reliance on the promise, the expectation and foreseeability of the promisee's reliance on the part of the promisor and injury to the promisee (*A–Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1404 (7th Cir.1992)). And of course the promisee's reliance must also have been reasonable and justifiable (*M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1408 (7th Cir.1991)).

■ Although Outside Directors have alleged promises by FHLBB and FSLIC, those promises were indisputably made to them only in their capacity as Horizon's Board members. Indeed, the promises *had* to be made to the Board, for only the Board could approve the mergers. But a promise to Horizon's Board in its official capacity was nothing more than a promise to Horizon

itself—plainly no promise was made to Outside Directors in their individual capacities.

To be sure, Outside Directors have alleged that the breach of the agreements with Horizon led to the termination of their positions on the Board (the only purported injuries that they can identify as individuals, as contrasted with damages to Horizon as an institution). But they have not even hinted at the existence of any of the elements of promissory estoppel as to their status as Board members (or, even more fundamentally, even as to the existence of any promise whatsoever by FHLBB or FSLIC in that respect). Hence, Outside Directors' promissory estoppel claim in Counterclaim Count II is also dismissed.

■ Next, FDIC seeks dismissal of the declaratory judgment claim on the ground that Outside Directors seek no additional relief there—that the declaratory judgment claim essentially duplicates the breach of contract claim. Outside Directors counter that their claim contains all necessary elements and that the existence of another remedy does not preclude a declaratory judgment. They seek a declaration that FDIC was contractually obligated to recognize Horizon's supervisory goodwill until the year 2002, and that in refusing to do so in December 1989 FDIC breached the agreement. That is nothing more than a reframing of the already-rejected breach of contract claim. Counterclaim Count III is dismissed as well.

■ Finally, FDIC argues that Outside Directors' recoupment claim fails as a matter of law. In that regard, Outside Directors allege (Counterclaim ¶¶ 35–37) that from the time of the mergers in 1982 until Horizon was placed into receivership in January 1990, FHLBB and FSLIC actively participated in and supervised Horizon's business affairs, so that any losses that FDIC claims were caused by Outside Directors' gross negligence were actually caused by FHLBB and FSLIC. Hence, they assert, any damages recovered by FDIC from them in this action are subject to recoupment (*id.* ¶ 38). FDIC characterizes that claim as a restatement of affirmative defenses challenging FHLBB's and FSLIC's actions, which were previously dismissed by Judge Plunkett's October 5,

1995 memorandum opinion and order. Outside Directors respond that here they challenge the pre-receivership conduct of FHLBB and FSLIC, while the affirmative defenses went only to post-receivership conduct.

At the outset it is worth noting that this last response is belied by the allegations of the recoupment claim itself. Counterclaim 1 38 alleges that "Counter–Defendants' operational control of Horizon after its take-over on January 11, 1990, also caused the alleged losses that are now the subject of the RTC's complaint." On its face that allegation attempts to revive the already-stricken affirmative defenses, and this Court rejects any revisiting of the issues decided by Judge Plunkett.

But Outside Directors' entire recoupment claim fails for an even more basic reason. As *Northern Trust Co. v. Peters,* 69 F.3d 123, 135 (7th Cir.1995) (emphasis added) has explained:

> Recoupment is a defense applicable in situations where the same transaction or contract gives rise to the claims asserted in the original complaint and a subsequent counterclaim. It involves the right of the defendant to have the plaintiff's monetary claim reduced by virtue of a claim by the defendant against the plaintiff *arising out of the same contract.*

*Northern Trust* held that a defendant's recoupment claim was not viable where plaintiff's claim was based upon a promissory note executed by defendant and a third party, while the defendant's counterclaim was not based upon the promissory note.

In this instance Outside Directors contend that their recoupment claim is based upon the same "transaction" as FDIC's gross negligence claim against them because the real issue to be decided in this case is what caused Horizon's insolvency. Not so. FDIC has sued Outside Directors only for gross negligence over their approval of certain loans, not for having caused Horizon's insolvency. Horizon's insolvency as such is not at issue in FDIC's claim; it did not become part of this case until Outside Directors filed their Counterclaim. Hence, even under the broad

definition of "transaction" proposed by Outside Directors (a breadth that is inconsistent with *Northern Trust*), not even the same transaction is at issue here.

Even if the recoupment claim were to be read more narrowly to address only FHLBB's and FSLIC's supervision of Horizon before its insolvency rather than Horizon's insolvency per se (a reading not advanced by Outside Directors), it would suffer from the same defect. Outside Directors allege only in general terms that FHLBB and FSLIC "actively participated in and supervised the business affairs of Horizon," and that such participation caused Outside Directors to rely on them "so as to preclude the gross negligence alleged in Count III of the Complaint" (Counterclaim ¶¶ 35–37). It is not reasonably inferable that the claimed reliance on FHLBB and FSLIC caused Outside Directors' approval of the challenged loans.

However it may fairly be read, this last aspect of the Counterclaim is also defective. Count IV is also dismissed.

\* \* \* \* \* \*

In sum, the allegations in the Counterclaim do not state viable claims in any respect. FDIC's motion to dismiss the Counterclaim is granted in its entirety.

### Motions To Strike Evidence

Rule 56(e) teaches that the affidavits and other materials submitted on a motion for summary judgment may be considered only to the extent that the statements contained there would be admissible at trial (*Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 849 (7th Cir.1992) (per curiam)). Outside Directors have moved to strike FDIC's Ex. 17 in opposition to the motions for summary judgment. That exhibit is the administrative deposition of Wallace, Horizon's former Vice President of construction lending. Outside Directors contend that the administrative deposition is inadmissible hearsay under Fed.R.Evid. 802 and 804(b)(1) because they had no notice of it and then had no opportunity to cross-examine Wallace. FDIC counters that Wallace adopted his administrative deposition testimony during his

deposition in this action, when defendants had a full opportunity for cross-examination.

Although Outside Directors approach the problem as though the inadmissibility of the administrative deposition is at issue, the proper focus is on whether or not Wallace adopted that testimony during his civil deposition in this action. There is no dispute that defendants' counsel were present at the civil deposition and had the opportunity to cross-examine Wallace there. If Wallace adopted his prior testimony at that time, it ceased to be an out-of-court statement and was no longer hearsay as defined by Fed.R.Evid. 801(c). As the Advisory Committee Notes to Fed.R.Evid. 801(d)(1) explain:

> If the witness admits on the stand that he made the [prior out-of-court] statement and that it was true, he adopts the statement and there is no hearsay problem.

*Bell v. City of Milwaukee*, 746 F.2d 1205, 1274 (7th Cir.1984) likewise teaches that when a witness affirms and adopts a prior out-of-court statement, the statement becomes part of the witness' testimony and is not hearsay.

Wallace's deposition in this action included the following exchange between him and FDIC's counsel (Wallace Dep. 13, 15–16):

Q: Have you reviewed any documents in preparation for your testimony here today?

A: Yes.

Q: Can you tell me what you have reviewed?

A: I reviewed my deposition of 10/12/92, and the corresponding exhibits.

\* \* \* \* \* \*

Q: ... Do you recognize this [Ex. 17] to be a copy of your administrative deposition from October of 1992, not including the exhibits?

A: Yes.

Q: Mr. Wallace, as you sit here today, do you have any reason to believe that the answers that you gave are in any way inaccurate as reflected in that transcript?

MR. O'KEEFE [counsel for Wallace]: I am going to object to the question.

MR. RUBINSTEIN [counsel for Merrifield, Ballin, O'Boyle and White]: You may answer it.

\* \* \* \* \* \*

A: I don't think they are inaccurate; but in reading the deposition, as long as everything is taken within context, I can explain the answers if further explanation is required.

Q: I take it that when you gave your testimony in October of 1992, you believed that you were answering my questions truthfully, is that correct?

A: Correct.

Q: As you sit here today, is that still the case?

A: Right.

Outside Directors' Mem. 5 argues that Wallace did not adopt his prior testimony because FDIC failed to point out to Wallace specific questions and answers from his administrative deposition and to ask him whether the answers accurately reflected his testimony. They contend that as a result Wallace failed to adopt unambiguously any particular statement in the administrative deposition transcript, much less all the statements in that transcript. They also contend that the proper adoption of an out-of-court statement requires the witness actually to repeat and adopt the particular statement, in order that the witness' demeanor may be assessed and that the witness may be cross-examined on the statement.

■ Simply to state those contentions is to reject them. Outside Directors have cited no authority for the patently absurd proposition that a witness must *repeat* an out-of-court statement in order to adopt it. If and to the extent that an adversary wishes to challenge a blanket adoption as insufficient or unreliable in any respect, cross-examination provides an ample opportunity to implement that challenge. And as for the other facet of Outside Directors' argument, by definition a deposition affords the finder of fact no opportunity to observe and assess the witness' demeanor. Any claimed requirement of that nature could apply (if at all) only if a witness testifying at trial sought to adopt an earlier out-of-court statement. So

the relevant questions are not those posed by Outside Directors' unpersuasive arguments, but rather (1) whether Wallace did adopt his earlier deposition testimony and (2) whether defendants had an adequate opportunity for cross-examination. Neither of those questions poses any difficulty.

As for the first, the earlier quotation from Wallace's deposition clearly calls for an affirmative answer. FDIC's counsel first confirmed that Wallace had recently reviewed his prior testimony. That established familiarity and made it entirely proper to follow up by asking whether Wallace believed that the answers he had given as reflected in that transcript were inaccurate in any respect. And Wallace's reassurance in that regard, coupled with his invitation to inquire further in any areas needing further explanation, leads directly to scrutiny of the second (ability to cross-examine) question.

That inquiry also gets a quick and unequivocal "yes" answer. All defendants had the transcript of Wallace's administrative deposition available to them for six months before his two-day deposition in this case. What has been quoted earlier took place within the first few minutes of the civil deposition. So Outside Directors had an ample opportunity both to clarify Wallace's adoption if they felt his responses were ambiguous and to cross-examine him regarding the substance of his administrative deposition testimony. In summary, the adoption of the earlier deposition takes it out of the category of inadmissible hearsay. Hence the motion to strike that deposition is denied.

■ Outside Directors also seek to strike the affidavits of Harold Kline ("Kline") and Karl Guntermann ("Guntermann") on the grounds that each lacks personal knowledge of the factual matters recited in his affidavit, that there is no proper foundation for the opinions expressed in the two affidavits and that the affidavits improperly contain conclusions that invade the province of the trier of fact. This motion is rendered moot because the deposition testimony of the fact witnesses (including defendants themselves), as well as the documents submitted as exhibits, are more than sufficient to demonstrate the existence of significant issues of material

fact. Thus it will become plain that summary judgment must be denied even without considering the challenged affidavits. Of course, defendants are free to challenge the admissibility of the testimony of those expert witnesses at trial.[11]

### Defendants' Summary Judgment Motions

In considering the parties' submissions on defendants' Rule 56 motions, this Court does not weigh the evidence or determine the truth of disputed matters (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)). All facts are viewed and all reasonable inferences are drawn in the light most favorable to the non-movant (*Transamerica Ins. Co. v. South,* 975 F.2d 321, 327 (7th Cir.1992)). "If no reasonable jury could find for the party opposing the motion, it must be granted" (*Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995), citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510).

All defendants have moved for summary judgment.[12] Generally they assert that FDIC cannot put forth evidence to establish that they acted with "gross negligence," so that they are entitled to a judgment as a matter of law. FDIC not only disputes defendants' definition of "gross negligence," but also contends that the record is replete with factual disputes requiring the denial of summary judgment.

Because Horizon was federally chartered, *RTC v. Gallagher,* 10 F.3d 416 (7th Cir.1993) and *RTC v. Chapman,* 29 F.3d 1120 (7th Cir.1994) have held that both state law and federal common law have been preempted by 12 U.S.C. § 1821(k) as to the applicable standards of conduct for director responsibility.[13] FDIC has perforce sued under that statute's "gross negligence" standard. Because the statute expressly refers to state law for the definition of its terms, both Judge Plunkett in this case (in his February 17, 1995 opinion at 9) and our colleague Honorable Brian Barnett Duff in *RTC v. Franz,* 909 F.Supp. 1128, 1139 (N.D.Ill.1995) have held that the Illinois case law that gives content to the concept of "gross negligence" controls.

Outside Directors Mem. 3 would equate "gross negligence" with "recklessness," which in turn means "a course of action which ... shows an utter indifference to or a conscious disregard for a person's own safety and the safety of others." Like *Franz,* 909 F.Supp. at 1141, that approach draws on some language in *Ziarko v. Soo Line R.R.,* 161 Ill.2d 267, 204 Ill.Dec. 178, 182, 641 N.E.2d 402, 406 (Ill.1994). Outside Directors explain that in those terms "gross negligence" contains a subjective element that differentiates it from simple negligence. Samuels concurs. For its part, FDIC points to the definition in *Massa v. Department of Registration and Education,* 116 Ill.2d 376, 107 Ill.Dec. 661, 666, 507 N.E.2d 814, 819 (Ill.1987):

> Gross negligence is commonly understood to encompass "very great negligence, * * * [b]ut it is something less than the willful, wanton and reckless conduct" [defendant] claims it to be. (Black's Law Dictionary 932 (5th ed.1979).)

Other efforts to explain the "gross negligence" concept include our own Court of Appeals' discussion in *Archie v. City of Racine,* 847 F.2d 1211, 1219 (7th Cir.1988), quoting *Wilson v. Brett,* [1843] 11 M. & W. 113, 116, 152 Eng. Rep. 737 (Rolfe, B.), as having labeled the concept as "simply negli-

---

11. Because this case remains on Judge Plunkett's calendar, this Court eschews any rulings that are unnecessary to the resolution of the current motion. This also makes any current consideration of Outside Directors' "missing documents" argument (advanced in connection with the Kline and Guntermann affidavits) unnecessary.

12. Outside Directors and Samuels filed their own summary judgment motions. Samuels also joined in the motion brought by Outside Directors, and Gravee, Maher and Williams joined in both motions. Therefore, this opinion addresses the relevant issues as they relate to defendants as a group, rather than individually.

13. That question is now before the Supreme Court in *Atherton v. FDIC,* No. 95–928, 1996 WL 656328 (argued Nov. 4, 1996), because the Third Circuit has reached a different conclusion on the federal common law question (*RTC v. Cityfed Fin. Corp.,* 57 F.3d 1231 (3d Cir.1995)) and the Supreme Court has granted certiorari to resolve the conflict. If *Atherton* were to be affirmed, FDIC will surely amend its Complaint to charge simple negligence.

gence 'with the addition of a vituperative epithet.' "

With all due respect to the *Franz* discussion and analysis, it leans too heavily on the single statement in *Ziarko,* 204 Ill.Dec. at 182, 641 N.E.2d at 406:

> Our case law has sometimes used interchangeably the terms "willful and wanton negligence," "gross negligence," and "willful and wanton conduct."

In the course of addressing those different articulations of standards of liability for a quite different purpose—that of deciding whether a defendant found guilty of "willful and wanton conduct" should be precluded from obtaining contribution from another defendant found guilty of ordinary "negligence"—the Illinois Supreme Court figuratively scratched its head over the numerous formulations in earlier cases and summarized (*id.,* citations omitted):

> Thus, the label "willful and wanton conduct" has developed in this State as a hybrid between acts considered negligent and behavior found to be intentionally tortious. This hybrid character of willful and wantonness is reflected in case law decisions of this State, which have recognized that willful and wanton acts share many similar characteristics with acts of ordinary negligence. In *Burke [v. 12 Rothschild's Liquor Mart, Inc.,* 148 Ill.2d 429, 170 Ill.Dec. 633, 593 N.E.2d 522 (1992) ], this court expressly acknowledged that negligent and willful and wanton conduct "share some characteristics." This court has previously observed that there is a "thin line" between simple negligence and willful and wanton acts. The comments of this court in *Myers v. Krajefska* (1956), 8 Ill.2d 322, 134 N.E.2d 277, are particularly apt: "[Willful and wanton conduct] is generally considered in that area of fault between ordinary negligence and actual malice. In view of the fact that it is a matter of degree, a hard and thin line definition should not be attempted." Under the facts of one case, willful and wanton misconduct may be only degrees more than ordinary

negligence, while under the facts of another case, willful and wanton acts may be only degrees less than intentional wrongdoing.

Neither that discussion nor the entire *Ziarko* approach, which disclaimed a definition rather than adopting one, and which mentioned "gross negligence" only in passing, can be allowed to override a decision by the Illinois Supreme Court that addressed that term—now adopted by 12 U.S.C. § 1821(k)—expressly. Where Illinois law provides the rule of decision, the Illinois Supreme Court is to be taken at its word—and for better or worse, that means the *Massa* definition espoused by the FDIC. Most importantly for present purposes, it calls for the rejection of defendants' arguments that their good faith and lack of motive to injure Horizon or its depositors exonerates them of liability under the statutory "gross negligence" standard.

At its core, defendants' argument that FDIC cannot prove gross negligence is that FHLBB conducted examinations of Horizon on at least a yearly basis, that in doing so it approved Horizon's ADC lending practices and that where the regulators approved the practices FDIC cannot now be heard to say that those practices were grossly negligent. But the success of that argument depends on the acceptance of defendants' interpretation of the factual record. As stated earlier, Rule 56 mandates the opposite perspective: one that views all facts and draws all reasonable inferences in the light most favorable to nonmovant FDIC and *not* to defendants. But an extended review of the record discloses more than enough material issues of disputed fact.[14]

### Horizon's Standards for Loan Approvals

FHLBB's annual examinations of Horizon (P. Exs. 24, 37, 38, 47, 60) found serious deficiencies in its underwriting policies and standards for ADC loans, criticized its reliance on Markham and McKay and advocated the adoption of written policies relating to such loans. Although defendants take strong

---

**14.** What follows does not purport to be an exhaustive discussion of factual disputes, but it is plainly enough to resolve the current motions.

exception to those criticisms,[15] the reports and related correspondence, written contemporaneously with the events at issue, cannot be ignored just because defendants quarrel with them. Those reports reflect, among other things, that in 1984 FHLBB requested that Horizon temporarily halt its ADC lending until more adequate underwriting and monitoring procedures were put in place (D.Ex. 36) and that in 1987 FHLBB similarly asked that Horizon temporarily stop making loan commitments to either Markham or McKay until its procedures improved (P.Ex. 51 at 2). Again defendants' disagreement with the regulators' conclusions merely creates a factual dispute—it does *not* mean this Court must accept defendants' version.

But even beyond that, substantial portions of defendants' own deposition testimony are at odds with their arguments in support of summary judgment. For example, Merrifield agreed with Wallace's administrative deposition testimony that Horizon's underwriting standards were constantly changing for every loan approval and that Horizon had no underwriting standards (Merrifield 11/20/95 Dep. 293–94). None of Outside Directors or Samuels could identify written underwriting policies for ADC lending other than the standard resolutions adopted by Board (see, e.g., Ballin 12/6/95 Dep. 138–39; Merrifield 11/21/95 Dep. 253, 278; O'Boyle 11/13/95 Dep. 146–47, 436–37; Samuels 12/12/95 Dep. 69). In contrast, insider Maher testified that Board specifically adopted underwriting procedures and policies other than the standard resolutions (Maher 1/23/96 Dep. 65–66). What is significant, though, is that the other testimony lends added validity to some of the regulators' criticisms.

On another aspect of the critical comments, Wallace testified that he thought Board knew that Gravee and Maher were relying on Markham to do underwriting (Wallace 10/12/92 Admin. Dep. 116). O'Boyle agreed that Maher relied on Markham in that respect (O'Boyle 11/13/95 Dep. 342). As a Board member O'Boyle knew

that management was relying on Markham to a large extent to get the information underlying loan applications (O'Boyle 11/13/95 Dep. 344). Similarly, Porth knew of nothing that was done to verify the accuracy of Markham loan submissions such as Agua Dulce (Porth 6/9/92 Admin. Dep. 97). White testified at his administrative deposition that Wallace would rely to whatever extent he wanted on McKay (White Admin. Dep. 5/7/92 88). In contrast, Ballin testified that he imagined that management verified the information contained in borrowers' financial statements "[b]ecause we would never accept a statement just as it was presented to us" (Ballin 12/8/95 Dep. 210). Porth testified that many times he did not have confidence in management when they responded to Board's questions about loan submissions because information was often lacking and Board was never sure about the appraisals (Porth 6/9/92 Admin. Dep. 97–98). On the other hand, Merrifield testified that Board knew that the loans were not being underwritten by the brokers (Merrifield 11/20/95 Dep. 119). Once more the pro-FDIC aspects of that evidence must be credited for Rule 56 purposes.

There are a substantial number of other instances that this Court has noted where defendants' own testimony supports rather than refutes FDIC's position. It is unnecessary to prolong the discussion, for under Rule 56 there is no need to multiply the number of disputes as to material facts.

### Effect of Horizon's Responses to FHLBB Criticisms

According to O'Boyle (his 11/13/95 Dep. 48), Board expected FHLBB to reply if it disagreed with Horizon's response to an examination. But no Board member testified that such an expectation was ever discussed or confirmed with FHLBB itself. And Kalina's extended testimony (see, e.g., his 3/12/96 Dep. 86, 124, 132, 342, 416–18, 424–25) totally undercuts the favorable inferences that defendants would seek to extract

---

15. Among other things, Outside Directors R. Mem. 6 n. 2 calls FDIC's citation to the 1989 examination report "disingenuous" because that report was never presented to Horizon and Horizon never had a chance to respond. That argument goes only to the weight to be given the 1989 report, not to its admissibility. And of course the current Rule 56 motions are not the occasion for the *weighing* of evidence.

from the absence of FHLBB replies to the Horizon responses. Again Rule 56 calls for the initial FHLBB criticisms and not the Horizon responses to be credited under such circumstances.[16] And indeed, as the next paragraph reflects, once more some of defendants' own testimony independently tends to discredit the Horizon responses.

With respect to Horizon's response to the 1987 annual examination (D.Ex. 53), O'Boyle acknowledged that its statement about Horizon's profits from residential mortgages brokered through Markham and McKay did not rebut FHLBB's specific criticism of Horizon's underwriting practices on ADC loans, because the response addressed non-ADC loans (O'Boyle 11/14/95 Dep. 390). Merrifield testified that the statement in one of Horizon's responses to FHLBB that management always did underwriting without relying on third parties was not consistent with his understanding, for he thought that Markham and McKay did underwriting (Merrifield 11/20/95 Dep. 298–99). Those are simply examples that buttress the non-crediting (for present purposes) of Horizon's responses to the critical letters and examination reports from FHLBB—even some of defendants, then Board members, disagree with the accuracy of some of the statements made in those responses.

Although defendants now urge that FHLBB's approval of Horizon's business plans is one reason why FDIC cannot now prove gross negligence, O'Boyle admits that he understood that FHLBB's approval of the business plans was not at odds with FHLBB's criticisms of the mechanics that Horizon used to monitor loans (O'Boyle 11/13/95 Dep. 201). Similarly, Ballin testified that when Horizon submitted its business plans to FHLBB for approval, FHLBB was not at the same time approving Horizon's policies and procedures regarding the analysis and monitoring of ADC loans (Ballin 12/8/95 Dep. 207). Here too defendants' arguments are only that—they cannot undo the

effect of material disputes in this area of the litigation.

### Role (If Any) of Peat Marwick

Defendants also contend that the sufficiency of Horizon's ADC lending policies and procedures was confirmed by a Peat Marwick evaluation. But the existence of such an evaluation has not been confirmed by admissible evidence, as contrasted with inadmissible hearsay testimony (not always consistent, at that—see, for example, Ballin 12/6/95 Dep. 89, 246). In terms of documentation, the only record evidence is the 1986 Peat Marwick engagement letter (P.Ex. 43), which does not indicate that Peat Marwick was engaged to evaluate Horizon's policies and procedures. In sum, any argument based on Peat Marwick's involvement is a nonstarter.

### Ex–Director Samuels.

Because Samuels resigned as an outside director of Horizon at the end of 1985, that is the only year in which Board's activities are potentially actionable as to him (it has previously been decided that all prior years are barred by the statute of limitations). Samuels asserts that FDIC cannot prove Board's gross negligence during that year.

But the evidence shows that Board took action during 1985, either in the form of an original commitment or by modifications to existing loans (increases in the loan commitments), on two of the loans at issue in this case: Tidy Island and Power Road Medical Center. During the same year there were meetings between the regulators and Horizon about the ADC loans brokered by Markham and McKay, as well as correspondence regarding Horizon's authorization to resume ADC lending. In addition (and perhaps more importantly) the evidence indicates that Horizon's practices as to underwriting and monitoring of ADC loans brokered by Markham and McKay may not have changed substantially from 1984 through 1989. Whether or not that is actually the case is for the jury to decide. Thus while Samuels' position may

---

**16.** Outside Directors have tendered the affidavit of Leo Blaber, who served for more than a decade as President of the Federal Home Loan Bank Board of Chicago (D.Ex. 8). But his lack of demonstrated personal knowledge as to Horizon's operations or as to the validity of the FHLBB criticisms precludes the crediting of his affidavit in preference to FHLBB's contemporaneous examination reports and the Kalina testimony.

be somewhat different from that of other defendants, he has not established that there are no issues of material fact as to his Board tenure.

\* \* \*

 In summary as to defendants' Rule 56 motions, significant factual disputes remain in this case. It is for the ultimate factfinder to resolve such disputes. On the evidentiary record a reasonable jury could find for FDIC if it concludes that Horizon's ADC loan underwriting and monitoring practices were seriously deficient and that defendants repeatedly disregarded FHLBB's warnings about those deficiencies. Hence defendants' motions for summary judgment are denied.

### Conclusion

As stated earlier, for procedural reasons the Counterclaim against RTC will be treated as a counterclaim against FDIC, and the third-party complaint against FDIC is dismissed as moot. That leaves for decision FDIC's motion to dismiss the Counterclaim, which is granted in its entirety.

Next, Outside Directors' motion to strike the administrative deposition of Thomas Wallace is denied. Their motion to strike the affidavits of Harold Kline and Karl Guntermann is denied as moot.

Finally, all defendants' motions for summary judgment are denied. This action is set for a status hearing at 9:15 a.m. on February 3, 1997, to discuss preparations for trial.

### SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

It is extraordinary just how often serendipity operates in the judging process. This case presents a truly dramatic example of that phenomenon: Immediately after this Court had completed its opinion (the "Opinion") issued earlier today, it learned that the United States Supreme Court had in fact decided *Atherton v. FDIC* (see Opinion at 636 n. 13) just *yesterday*. And *Atherton*, —— U.S. ——, 117 S.Ct. 666, 136 L.Ed.2d 656

(1997), although rejecting any concept of federal common law in the course of upholding the "gross negligence" standard of 12 U.S.C. § 1821(k), also held that state law could establish an *ordinary* negligence standard of liability for both federally chartered and state chartered savings and loan associations (*id.* at ——, —— – ——, 117 S.Ct. at 674–76).

That decision effectively overturns our Court of Appeals' opinions in *RTC v. Gallagher,* 10 F.3d 416 (7th Cir.1993) [1] and *RTC v. Chapman,* 29 F.3d 1120 (7th Cir.1994) in the latter respect. It remains to be seen whether the prediction in Opinion at 636 n. 13 ("FDIC will surely amend its complaint to charge simple negligence") proves to be accurate.

---

1. Opinion at 30 contained a typographical error that mistakenly listed *Gallagher* as a Ninth Circuit case.