Jerome A. MAHER and John R. Gravee, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 98–61 C.

United States Court of Federal Claims.

Filed Jan. 24, 2001.

Reissued for Publication Feb. 7, 2001.

Camillo F. Volini, Chicago, Illinois, attorney for plaintiffs.

William G. Kanellis, with whom were Acting Assistant Attorney General David W. Ogden, Director David M. Cohen, Deputy Director Jeanne E. Davidson, Civil Division, Department of Justice, Washington, D.C., for defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS and DIRECTING DISMISSAL OF COMPLAINT

WIESE, Judge.

Plaintiffs are the former principal executive officers of Horizon Federal Savings Bank (the bank), a now-defunct mutual savings and loan association. Their suit, which was transferred to this court from the United States District Court for the Northern District of Illinois, seeks recovery of the employment compensation and other job-related benefits that were denied them upon the termination of their positions by the Resolution Trust Corporation ("RTC"), acting as receiver for the bank. They allege a breach of contract by the Government.

Defendant has moved for dismissal of the suit for lack of jurisdiction or, alternatively, for failure to state a claim upon which relief can be granted. Plaintiffs oppose. The issues have been briefed and argument on the matter was heard on January 18, 2001. At the conclusion of the argument, and for reasons then explained by the court, a ruling was entered in defendant's favor. This Order formalizes that ruling and briefly restates the bases for the court's decision.

I

In early 1982, the bank (then known as First Federal Savings and Loan Association of Wilmette) entered into a series of government-sponsored supervisory mergers with three financially-troubled savings and loan associations. To facilitate these mergers, the resulting institution—renamed Horizon Federal Savings Bank—was granted certain regulatory forbearances by the banking authorities.

As the principal executive officers of the acquiring institution (First Federal), plain-

tiffs played a large role in the negotiations that led to the bank mergers as well as in the drafting of the various agreements between the bank and its regulators (then the Federal Home Loan Bank Board and the Federal Savings and Loan Association) establishing the regulatory framework under which the newly-formed institution would be permitted to operate (the supervisory merger agreement). Moreover, to secure regulatory approval of the mergers, plaintiffs were required to relinquish a portion of their annual compensation—at least temporarily—in order to support the new bank in the conservation and growth of its capital.

Plaintiffs remained at the helm of the new institution until the RTC's termination of their employment in mid–1990, some six months after the bank had been declared insolvent because of its inability to satisfy the increased regulatory capital requirements imposed upon the banking industry through the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified as amended in various sections of 12 U.S.C.).

The case we have before us now draws in large part upon plaintiffs' involvement in the formative events leading to the new bank's creation and upon their contribution to the business operations of that bank during the years preceding its insolvency. Plaintiffs point out that, at the time the supervisory merger agreement was under discussion, federal banking authorities were made aware of their individual compensation arrangements with the bank. Indeed, a temporary reduction in the compensation owed under those arrangements was one of the requirements imposed by the authorities as a condition for approval of the merger agreement. Thus, according to plaintiffs, by subsequently agreeing to the terms of the supervisory merger agreement with the bank, regulatory authorities necessarily agreed to honor the terms of their particular compensation arrangements with the bank as well. It is on this basis then that plaintiffs now claim that they have an implied-in-fact contract with the Government or, alternatively, that they are third-party beneficiaries of the bank's con-

tract with the Government. In either case, however, their ultimate contention is that the RTC's repudiation of their employment contracts with the bank was endorsed by the Government and thus the Government breached its commitment to honor those contracts.

## II

We cannot accept this argument for lack of facts to support it. Contracts are formed through an exchange of promises—through commitments to act or refrain from acting in a specified way—that are evidenced in a writing or are inferable from conduct. We have neither writing nor conduct here. Plaintiffs were not parties to the Government's supervisory merger agreement with the bank, they cite no language in that agreement supportive of the promises they now allege, and they reference no course of dealing between the parties from which the existence of such promises might reasonably be inferred. Rather, the whole of plaintiffs' case rests on the naked proposition that, by entering into a contract with the bank, the Government entered into a contract with them as well or, alternatively, that as part of its contract with the bank, the Government also assumed special commitments for their benefit. The argument cannot succeed.

Indeed, precisely the same argument was presented to the District Court for the Northern District of Illinois in an action brought there by the RTC against the officers and directors of the present bank alleging mismanagement of the bank's affairs. As part of their defense in that action, the outside directors raised, as a counterclaim, the contention that the RTC's termination of their positions at the bank was in violation of contractual protections afforded those positions by the bank's supervisory merger agreement with the federal regulatory authorities. The district court rejected the argument saying:

Although Outside Directors have alleged promises by FHLBB and FSLIC, those promises were indisputably made to them only in their capacity as Horizon's Board members. Indeed, the promises had to be made to the Board, for only the Board

could approve the mergers. But a promise to Horizon's Board in its official capacity was nothing more than a promise to Horizon itself—plainly no promise was made to Outside Directors in their individual capacities.

To be sure, Outside Directors have alleged that the breach of the agreements with Horizon led to the termination of their positions on the Board (the only purported injuries that they can identify as individuals, as contrasted with damages to Horizon as an institution). But they have not even hinted at the existence of any of the elements of promissory estoppel as to their status as Board members (or, even more fundamentally, even as to the existence of any promise whatsoever by FHLBB or FSLIC in that respect).

*FDIC v. Gravee*, 966 F.Supp. 622, 632–33 (N.D.Ill.1997).[1]

Plaintiffs attempt to overcome the deficiencies in their case by saying that they should be entitled to demonstrate at trial the truth of the facts they allege. However, it is not doubt about the truth of their assertions that defeats their claim. It is, rather, that the facts they have pled, even when taken at face value, are insufficient, as a matter of law, to make out a contract claim against the United States.

### III

For the reasons stated, defendant's motion to dismiss is granted and the Clerk is directed to dismiss the complaint. Costs shall not be assessed.

---

**1.** The claims of plaintiffs Jerome Maher and John Gravee that are now before this court were initially raised, by way of counterclaims, in the case cited—*FDIC v. Gravee*, 966 F.Supp. 622 (N.D.Ill.1997). For reasons not explained in the record, the counterclaims were not adjudicated by the district court but, instead, were transferred here by order of June 23, 1997.